[Crim. No. 16157. In Bank. June 20, 1974.]

In re JEROME WEBER on Habeas Corpus.

704

## COUNSEL

Ball, Hunt, Hart, Brown & Baerwitz, Clarence S. Hunt and Michael F. Richman for Petitioner.

Evelle J. Younger, Attorney General, Herbert L. Ashby and Edward A. Hinz, Jr., Chief Assistant Attorneys General, Doris H. Maier, Assistant Attorney General, S. Clark Moore, Russell Iungerich and Alan G. Novodor, Deputy Attorneys General, for Respondent.

## OPINION

McCOMB, J.—Petitioner, an attorney, who is serving a sentence for conviction of the crime of soliciting another to offer a bribe, in violation of section 653f of the Penal Code, petitioned this court for a writ of habeas corpus. He claimed that he had newly discovered evidence to the effect that Thomas Devins (also known as Thomas Utter), the person whom he allegedly solicited to offer a bribe, had "framed" him; that such evidence, if credited, would undermine the entire case of the prosecution and point unerringly to his innocence; and that, accordingly, habeas corpus was an appropriate remedy. (*In re Branch*, 70 Cal.2d 200, 213-215 [74 Cal.Rptr. 238, 449 P.2d 174].) Under the circumstances, this court appointed a referee to determine (1) what new evidence, if any, had been discovered since petitioner's trial; (2) if there was any such evidence, whether it would, if credited, undermine the entire case of the prosecution; and (3) if there was any such evidence, whether it should be credited. After conducting an evidentiary hearing, the referee filed findings herein and concluded that petitioner had discovered no new credible evidence undermining the case presented by the prosecution at petitioner's trial.

The Attorney General, in his return to the order to show cause herein and his brief in support of the findings of the referee at the evidentiary hearing, has accurately and in great detail set forth the applicable background data and a summary of the evidence introduced at the evidentiary hearing. This court, accordingly, adopts the Attorney General's statements, which may be summarized as follows:

*Testimony of Thomas Devins at Petitioner's Trial*[1]

In March 1969, while Devins was under investigation by the Los Angeles District Attorney's office on suspicion of murder, he retained petitioner as his legal counsel with respect thereto. At his first meeting with petitioner, Devins paid him $2,500, and a few weeks later paid an additional fee of $1,500. He paid petitioner no further sums as fees.

The investigation against Devins was being conducted by a Mr. Burnett, of the Santa Monica branch of the district attorney's office. Petitioner indicated to Devins that he did not know "any of the boys in the Santa Monica office" and would try to have the matter transferred to the downtown office, as that was where his "juice" was. A week or two later, petitioner reported to Devins that he had succeeded in having the matter transferred to the main office, where he had control; that unfortunately he had not been able to have it taken from Mr. Burnett; but that Mr. Burnett's superior was one of his (petitioner's) "boys."

About the beginning of the second week after Devins had retained petitioner as his attorney, he first heard him use the term "policy." Petitioner informed Devins that it was possible to buy a "policy" to suppress an investigation, particularly in situations where the district attorney's investigation had merely uncovered suspicious circumstances but had not as yet produced concrete evidence of a crime. Petitioner informed Devins that he would not be under any pressure to buy such a "policy," but that if he did so, the investigation would be stopped and the file placed in the inactive section.

At one point, after telling Devins that he was having difficulty arriving at a fee with his contacts in the district attorney's office, petitioner showed Devins an investigative report indicating what progress had been made in the investigation of Devins' activities to that date (which report ordinarily would never have been shown to anyone outside the bureau of

---

[1]On June 22, 1971, in *People* v. *Weber*, 2d Crim. 18794, the Court of Appeal for the Second Appellate District, Division Four, in an unpublished opinion, affirmed petitioner's conviction. Devins' testimony is contained in the reporter's transcript, which is part of the appellate record in that proceeding.

investigation in the district attorney's office), to show Devins what kind of service his "boys" were giving him.

Some weeks later, petitioner showed Devins the report again and said that the policy was available. He also stated, however, that although he had originally thought the "policy" might be for just a few thousand dollars, the members of the district attorney's staff performing the service for petitioner now wanted $25,000, and petitioner felt that an additional $10,000 should be included for his own services in obtaining the "policy," making a total of $35,000.

After hesitating for some time, Devins finally agreed to buy the "policy" and told petitioner he would be out of the state for about 30 days in order to raise the money. When he returned, he reported to petitioner that he had arranged to obtain $35,000 and would have it in cash in a few days. Petitioner stated to him, "Now, my boys there are in control and they are not flunkies, they are right at the top." He further said that he had informed them that the money would be available at the end of the 30-day period, as agreed.

Devins made several appointments to meeet petitioner and turn the money over to him in $100 bills. After the first appointment, which he failed to keep, Devins telephoned the Attorney General's office and asked if that was the proper governmental agency to investigate possible blackmail involving members of the district attorney's office. Thereafter, Devins again met petitioner but still did not give him the money.

Subsequently, special agents of the Attorney General's Bureau of Criminal Identification and Investigation equipped Devins with a miniature tape recorder, whose microphones were hidden from plain view beneath his clothing. Devins then made an appointment with petitioner for dinner on June 26, 1969, at the Friars Club, where in a three-hour conversation there was further discussion of the "policy." When they left the club, Devins agreed to pick up the money at his home, and meet petitioner at his home a little later, but Devins did not do so. Instead, he met one of the special agents at his own home and turned over to him the tape recorder, but the special agent was unsuccessful in making the recorder play.

The following day, Devins was again equipped with a miniature tape recorder concealed on his person; and at 4:15 p.m. he went to petitioner's office, where he conversed with petitioner for about an hour and a half. The two agreed to meet again later. The special agent removed the tape recorder from Devins' person outside the building. At a meeting there-

after in the Attorney General's office it was suggested that Devins produce a sum of money sufficiently large in quantity to convince petitioner that the sum was $35,000.

On June 30, 1969, Devins met some of the investigators and showed them that he had $6,700 with him. The money was counted and the serial numbers recorded. The money was placed in four envelopes in such a way as to make it appear that it was a larger sum than it actually was.[2] Devins was equipped with a hidden transmitter, as well as a body tape recorder; and a receiving unit was set up in the vehicle of one of the special agents, who observed Devins enter the building in which petitioner's office was located.

While Devins was in petitioner's office, he placed the money on the desk in front of him. At one point, petitioner picked up the envelopes containing the money, walked over to a closet, and put the four envelopes of money in a coat hanging in the closet. At this time, Devins did not owe petitioner any money, and the money was not to be used to pay a fee for legal services. Later, Devins retrieved the money, and then turned the recording device and the transmitter over to the special agent waiting outside.

At a meeting at the Friars Club at 8 p.m. that same day, Devins was again equipped with a recording device and a transmitter. Petitioner told Devins that he had, while he was unaware that Devins had left with the money, telephoned his "boys" and told them he had possession of the money and that they had then taken the necessary steps to cancel the investigation. Devins had the envelopes with the money before him while he and petitioner were talking, and petitioner told him to put all the money in one larger envelope when he came to petitioner's office the following Monday. Devins left with the money, and the recorder and the transmitter were removed from his person by the agents when they met him shortly thereafter.

During the next couple of weeks, Devins made no attempt to contact petitioner. On July 23, 1969, Devins saw petitioner at his office. Again, he was equipped with a recorder and a transmitter, and the agents monitored the conversation. In accordance with instructions, Devins attempted

---

[2]One envelope contained most of the $100 bills, the other three envelopes containing the rest of the currency, divided into equal portions. Two or three $100 bills were placed at the front and back of each of the separate bundles, so that they would appear to be all $100 bills if opened. The envelope containing most of the $100 bills was identifiable by a folded edge on the back.

to engage petitioner in conversations similar to the ones he had had with him on previous occasions; but each time Devins mentioned the word "policy," petitioner denied having any knowledge of what Devins meant. He said that their previous discussions had been only jokes and that what Devins was suggesting was quite impossible. In general, petitioner denied the content of the previous conversations. Upon leaving petitioner's office, Devins turned the recorder and the transmitter over to the special agents.[3]

---

[3]Although the tapes do not unerringly point to petitioner's guilt, they contain numerous statements by petitioner which sufficiently corroborate Devins' testimony. Thus, the tapes reveal, among others, the following statements:

*First Recorded Conversation (June 27, 1969)*

At one point, petitioner said, "Well, the target really has got to be before July first." Later, he stated, "If you want me to do it—give me the loot—give me my head and let me go to work." When Devins asked petitioner, "[H]ave they ever failed to come through—that is, have they ever taken any bread and then that's it?" petitioner answered: "Oh, no, no. Never in a million years. Never." He also said, "If I back out you're going to be indicted." He later asked Devins if he understood "that I'm flirting with my license," and he said, "If you do it this way it would be over with by Monday or Tuesday." When Devins said that he had assets but was not liquid, petitioner replied: "They know what you've got. All I know is what I submitted— I was a relay boy. 'Period.' If we negotiate and it's in an envelope . . . you know what I mean . . . I wanted the service and I got it. Period."

*Second Recorded Conversation*

In this conversation, petitioner said something about "get that fucking money away from you before you change your mind." He mentioned that Devins was going to be indicted and then corrected himself to, "They were going to." The recording includes a telephone conversation by Devins with Agent Sana, of the Attorney General's office, during which conversation Devins related that petitioner had put the money in the coat in the closet. Before the second recorded conversation ended, petitioner expressed his fear that Devins might have him "wired and bugged."

*Friars Club Conversation*

Devins' conversation with petitioner at the Friars Club has an early reference to the "indictment." Devins said: "This bread right here. It could mean the difference between keeping me out and putting me in." Petitioner then told Devins, "Don't dangle it like bait in front of me." Later, petitioner stated, "This constant dialogue would indicate ordinarily that you were framing me, that you are setting me up either bugged or wired—follow me . . . ." Still later, petitioner said: "Now if I'm being framed I guessed wrong. I pay for it with the rest, for the rest of my life."

In this conversation, petitioner urged Devins: "Do it this way. Give me the 10 grand if you like—buy yourself a policy to this extent. That will be a fee if you like— I'll even give you a receipt for it, which will be applied that in the event they file suit on you this will be applied towards the fee." Petitioner then stated, "From the standpoint of integrity I should be calling them right now," and then told Devins, "Keep in mind this is a service that I personally solicited."

At another point in the conversation (evidently referring to the money), petitioner told Devins, "Better put it in a bigger envelope than this." He referred to Murphy and Stoner, of the district attorney's office, twice as "not in it [apparently referring to the policy]." Toward the end of the conversation, petitioner said, "They trust me implicitly, after all I am going to relieve them of the policy."

*Final Recording*

From this recording, it appears that petitioner had found out or suspected that the conversation was being recorded, and he made exculpatory statements therein.

*Summary of Evidence Adduced at the Evidentiary Hearing*

The evidence by which petitioner had hoped to establish that Devins had "framed" him by giving perjured testimony at petitioner's trial was testimony by Ronald Anderson, a cellmate of Devins at Deuel Vocational Institution that Devins had made such an admission to him. Anderson had so stated in a declaration dated September 29, 1971. On October 14, 1971, Anderson, in a subsequent declaration allegedly prepared by Devins, repudiated the September 29 declaration; but later, in a declaration executed November 20, 1971, he repudiated the October declaration and reaffirmed the truth of the September declaration.[4] As will hereinafter appear, however, Anderson became unavailable as a witness on behalf of petitioner.

In May 1972, Steve Wilmot, another inmate at the institution at which Anderson was then incarcerated, was killed; and Anderson was charged in San Luis Obispo County with his murder. On Monday, September 18, 1972, the time originally set for the evidentiary hearing herein, the referee stated that Mr. Richman, one of the attorneys from the firm representing petitioner, had on the previous Friday informed him that Anderson had been charged with murder in connection with Wilmot's death, and that possible legal problems could arise, in view of the fact that Wilmot was alleged to have had some relationship with Devins.[5]

Under the circumstances, the referee appointed Mr. Keith Johns, of the public defender's office to represent Anderson; and Mr. Johns advised the referee that Anderson could not testify at the evidentiary hearing while the murder charge against him was pending. Anderson advised the referee that he was trying to employ a private attorney to represent him. At petitioner's request, the evidentiary hearing was continued to December 11, 1972, in order to see if Anderson might become legally available at the conclusion of his trial in San Luis Obispo County. Thereafter, the matter was put over until January 22, 1973.

By that time, Anderson, represented by Mr. Orlan Donley and Mr. Robert Aitken, had entered a plea of guilty to second degree murder. Mr.

---

[4]It was stipulated by all counsel that Anderson's declarations constituted newly discovered evidence.

[5]According to subsequent testimony by Devins, Anderson had murdered Wilmot because the latter had possession of a document containing a version of events pertaining to Devins' and Anderson's discussions regarding Devins' murder case and the case involving petitioner. Devins had, in fact, telephoned Mr. Joseph Ball, a partner in the firm representing petitioner, a few days after the killing and told him "that directly or indirectly, [petitioner] had some part in the murder of Steve Wilmot because of the pressure he had placed Mr. Anderson under."

Aitken, although not himself representing petitioner, was with the law firm which represented petitioner. [6]

Upon questioning by the referee, Anderson indicated that he was satisfied with the representation he had received in the murder case and that he fully understood that Mr. Richman and Mr. Aitken were from the same law firm. He also indicated that he understood that in the event his murder conviction were set aside, and he had testified to any incriminating matters at the evidentiary hearing herein, such testimony could be used against him.

Mr. Aitken then indicated, in response to questions from the referee, that he felt that Anderson could testify at the evidentiary hearing and that there were no problems to prevent such testimony. At this point, the referee excused Mr. Aitken and prepared to start the evidentiary hearing. Anderson asked to remain behind after all the attorneys had left the courtroom. He then informed the referee that he did not feel sure about his representation and had felt pressure in pleading guilty. The referee then appointed Deputy Public Defender Charles Gessler to represent Anderson.

Mr. Richman had indicated to the referee a little earlier that a third person had paid his firm's fee for representing Anderson on the murder charge, and the referee asked that the identity of such person be revealed. Mr. Richman identified Western Computer Corporation as the entity paying the fee and the individual representing the company as Mr. Irving Tushner. He said that Mr. Tushner had no interest in the case except that he understood it was important to petitioner to have Anderson testify in his behalf and that Mr. Tushner was a very close friend of petitioner and wanted to do what he could to help him.

Anderson took the stand as a witness on behalf of petitioner, but when questioned about conversations he had had with Devins after they became cellmates, he refused to answer on the ground that his answer might

---

[6]Mr. Richman, one of the attorneys appearing on petitioner's behalf, stated that he had appeared at Anderson's initial arraignment in San Luis Obispo County, but that he had not consulted with Mr. Aitken regarding the handling of the case. He stated: "When it was determined last time that Mr. Anderson should not testify and that this matter should go forth first, I spoke to Mr. Anderson.

"And Mr. Anderson felt that he needed private counsel. And I felt that, frankly, that we had involved Mr. Anderson in a matter where if he kept his mouth shut in the first place, he probably wouldn't—he may not have been involved in the problem.

"So, I said that our firm would look into it and see if we could represent him."

Mr. Richman said that he had then spoken with Mr. Joseph Ball and Mr. Clarence Hunt, of his law firm, and received their approval for the firm to represent Anderson in his murder case.

tend to incriminate him. Petitioner's attorneys then asked the referee to grant immunity to Anderson with reference to any events occurring at Deuel Vocational Institution prior to, and including, October 17, 1971. The referee denied the request for a grant of immunity. Thereafter, Anderson refused to answer a long series of questions asked by petitioner's counsel, on the same ground that the answers might tend to incriminate him.

Anderson thus became unavailable as a witness for petitioner. As a result, petitioner sought to introduce in evidence the declarations hereinabove referred to, on the theory that they were admissible under the declarations against interest exception to the hearsay rule, set forth in section 1230 of the Evidence Code. Petitioner's counsel further presented a comprehensive offer of proof regarding testimony which counsel would seek to elicit from numerous witnesses regarding the declarations and various conversations had with Anderson about the alleged statements of Devins to him. The referee, however, ruled that Anderson's extrajudicial statements were inadmissible as declarations against interest under section 1230 of the Evidence Code.

Oliver B. Owen testified that he had been a minister of the gospel for 36 years. He said that on June 30, 1969, he had been in petitioner's law offices. At that time, petitioner was his counsel in two cases, a civil action and a criminal case. In the latter, according to Owen, he was falsely charged with shoplifting. Between 10 and 11 a.m. on June 30, Owen overheard petitioner mention Devins' name in a telephone call made to petitioner by a third person while Owen was in his office. Petitioner then said to Owen, "You think you have troubles, Curley this fellow has a murder rap."

Owen left petitioner's office but returned between 3 and 4 o'clock that afternoon. While Owen was with petitioner in the office, Devins came in. Petitioner introduced Devins and Owen, stating, "Curley, this is Mr. Devins. Mr. Devins, this is Curley Owen; he is a minister."

After Devins entered petitioner's office, Owen went outside to obtain a receipt from petitioner's secretary. While he was with petitioner's secretary at her desk, Owen overheard petitioner say: "You haven't got the fee in. Get the fee in and we will get the ball rolling." Owen did not recall hearing Devins say anything. Later, Owen went to another office and then left the building.

On October 23, 1969, Owen spoke with an investigator at the Los Angeles office of the Attorney General. He told the investigator that he was very, very bitter against petitioner, because he felt that he had been

unjustly convicted of shoplifting and that petitioner's office "had not represented [him] . . . ." He spoke with the investigator about his case and explained why he was angry with petitioner.

On October 29, 1969, Owen had a telephone conversation with Devins, in which the latter invited Owen and his wife to have dinner with him that evening at the Continental Hyatt House on Sunset Strip. They all met at the Continental Hyatt House, but other people were there with Devins; and an arrangement was made that Devins and Owen would meet again at 4:30 at the same place the next afternoon.

After Owen parked his car in the vicinity of the Continental Hyatt House the next afternoon around 4 o'clock, Devins drove up in a late model Cadillac. Devins sat in his car, and the two had a conversation, in the course of which Devins "started running [petitioner] down." Owen testified that Devins asked him to say that he had heard petitioner ask Devins to bring in "a $10,000 fee, an additional $25,000 or something" while Owen was at petitioner's office in June 1969. Owen said that he answered, "No, I didn't hear that." He said that he told Devins, "I heard [petitioner] say, 'Get the fee in here.'" Owen testified: "He wanted me to say that I saw him hand some money to [petitioner]. He wanted me to say I heard [petitioner] say, to the best of my memory, it was a $10,-000 fee, and $25,000, $20,000 or $25,000 to give somebody downtown to take care of the thing." Owen said that at this point in the conversation he noticed another person, named Mello Alexandria, standing near a telephone pole near where he and Devins had been talking.

Owen understood from Devins' remarks that Devins wanted him to lie for him. He said that he told Devins, "I would not perjure myself or lie for anything, all the money there was." However, his immediate reaction to what Devins had told him was to ask Devins, "Where in the world are you going to get twenty-five thousand?"

Owen testified that, to the best of his recollection, he first told petitioner about his October 30 meeting with Devins in either February or March 1972 and that he had never told petitioner about the meeting before that time. He said that he had told petitioner about the meeting when he visited petitioner while the latter was in custody at the California Institution for Men in Chino.

On March 15, 1972, Owen executed a declaration with respect to his October 30 conversation with Devins. In it, he said, "The reason I have not come forward before now is that I preach and give lectures all over the country, and was out of the state during the time when [petitioner]

had been indicted and was being tried." He admitted, however, that between May 1970 and March 1972 he had been "in and out" of California and that he had a "son in Orange County and a daughter here, with grandchildren."

Owen also said that he did not know that petitioner was being tried in April and May 1970. He stated that he had dismissed petitioner's law firm from representing him in the shoplifting case on August 19 or 20, 1969, but that petitioner had continued as attorney of record in another lawsuit for him.

Owen admitted that he saw petitioner on October 31, 1969, the day after Devins purportedly asked him to give perjured testimony against petitioner, but that he did not mention the conversation to him, because he "was very bitter." He further admitted that he had learned from his meeting with Devins on October 29, 1969, that petitioner had been indicted for charges growing out of his relationship with Devins. Owen maintained that the reason he did not tell petitioner about the conversation in which Devins purportedly solicited him to commit perjury was that he "was bitter" at petitioner and remained so until he saw him at Chino in 1972.

The referee concluded that Owen's testimony was incredible, and his findings set forth in detail numerous discrepancies and suspicious statements which amply support such conclusion.

Mello Alexandria testified that in October 1969 he lived near the Continental Hyatt House on Sunset Boulevard and that at that time he had occasion to see Reverend Owen speaking with someone in a Cadillac in that area. He said that he saw Owen standing near the car and came up behind him. He stated that "on this particular occasion [Owen] was shaking his head, and he was talking with some man in a car, and at that time I thought it was either another minister or one of his church people, you know." He further testified: "Well, like I said, I thought they was [sic] talking about religion and stuff, but I heard the man that was in the car—

"Well, the Reverend was saying—well, he was—his voice was kind of high and he was—sort of angry tones in his voice, to me.

"He says, 'No, I can't do that.'

"He says, 'You know, I can't tell a lie like that.'

"And so—and then I heard the man that was in the car say, 'Well, look,' [he] says, 'I give you $25,000, you know, if you just do like I tell you.'"

Alexandria stated that he overheard Owen refuse. He also overheard Owen ask the man where he would obtain that kind of money.

About this point, the man in the car, since Alexandria was standing right by the car, asked Owen who Alexandria was. Owen then introduced Alexandria to the man in the car. The man's name was Thomas Devins.

After meeting Devins, Alexandria walked up to his house, and Owen later joined him there. Alexandria testified as follows with regard to the conversation he then had with Owen: "Well, first when he came in, I was—there, again, because like I said, I thought it was some of his church people that was coming, because I was surprised, this was my first time with hearing, well, someone talking to a man of God, you know, like that.

"And being that the Reverend has helped me sort of like become a Christian in my life and the whole bit, so, I asked him, I says—I state to him something like, I says, 'Well, you've saved me.' I says, 'Anyway you can maybe save that gentleman?'

"And he states something to the effect, he says, 'Well, the world is full of people like that.'

"He says, 'The only thing you can do is just pray, like I always tell you to do.'

"And then he put his hand on my shoulder. And he said, 'Let us pray for him.'"

The referee concluded that Alexandria's testimony should not be credited, and he set forth in his findings numerous discrepancies and suspicious circumstances supporting such conclusion. It should be noted, also, that Alexandria did not claim that he heard Devins say anything about bribing Owen and, in fact, testified that the word "bribe" was not used by Devins. He further testified that Owen never told him that someone was paying him $25,000 to bribe him (Owen) to tell a lie.[7]

Thomas Devins had testified as a witness for the People at petitioner's trial in 1970. At the evidentiary hearing herein, he testified that at that trial he had been sworn to tell the truth and that the testimony he had given there was the truth, the whole truth, and nothing but the truth. He also testified that he had never, subsequent to petitioner's trial, told anyone that he retracted any portion of the testimony he had given at

---

[7]Interestingly enough, although Alexandria recalled the name of Devins and the substance of the conversation he had overheard three years before testifying at the evidentiary hearing, he could not recall the name of the investigator for petitioner's counsel even though he had been introduced to him only the preceding day.

the trial. He denied ever telling Anderson that he had given perjured testimony at petitioner's trial, and he said that he never told Anderson or anyone else that he had framed petitioner, either in the manner of a boast or otherwise. He further denied ever having offered to pay Owen $25,000, or any other sum, to testify falsely at petitioner's trial.

With regard to the conversation which Owen purportedly heard in petitioner's office on June 30, 1969, Devins testified that at that time he was equipped with a tape recorder, and his conversations with petitioner were recorded. He said that he had no recollection of Owen's being in the reception room of petitioner's office on that date and, in fact, had no recollection of ever having seen Owen until the day in October 1969 when he spoke with him at the Continental Hotel Coffee Shop. He further stated that he did not burst into petitioner's private office unannounced.

Petitioner, called as a witness in his own behalf, testified that prior to January 1, 1972, he had no knowledge of any meeting between Owen and Devins in the Hollywood area some time during the latter part of October 1969 or that a person named Mello Alexandria was present at any such meeting. He said that he first became aware of the conversation when Owen told him about it in the latter part of February or the early part of March 1972 while petitioner was an inmate at the California Institution for Men at Chino.

Petitioner said that he had received a letter from Ronald L. Anderson, dated August 26, 1971, but that before receiving the letter he had not known anyone by that name. After petitioner received the letter, he and Fred Mitchell visited Anderson at Deuel Vocational Institution. Petitioner had a conversation with Anderson there and spoke with him again after he had been transferred to the prison at Tehachapi.

On cross-examination, petitioner was asked whether Owen had come to his office on June 30, 1969. Petitioner answered, "I don't recall the exact date, but he was in and around that office at that time practically daily."[8] He said that he did not remember whether he had said to Devins in Owen's presence, "You haven't got the fee in. Get the fee in and we will get the ball rolling." He did not recall any specific time when he may have said such a thing in someone else's presence. He also stated that he did not ordinarily discuss the fee of one client in front of another

[8]Petitioner said that he personally or his secretary recorded appointments with persons who came to his office, but he said that his appointment book would not necessarily have reflected Owen's presence, because at the time Owen claimed to have been in the office and overheard petitioner's conversation with Devins, Owen was not petitioner's client, and the receipt he had obtained was for a fee he was paying to Mr. Bernard Mattison for services which Mr. Mattison was to render in his behalf.

client and that it was his practice as an attorney to preserve the confidentiality of communications with clients. He then appeared to contradict himself, however, by saying that it was ordinarily his practice to keep the door to his private office open when he had fee discussions and other discussions with clients; but he added that most conversations held in his private office could not be heard outside the office if carried on in a normal tone of voice. Petitioner had no specific recollection of ever introducing Devins to Owen.

Petitioner was cross-examined regarding whether he had made any promises to Anderson. He was asked about a letter he had received from Anderson, in which the latter had stated: "When you came up to visit me last time you told me that if I needed anything I'd let you know . . . I hate to ask but I would like to have a record player and a few albums." Petitioner said that he had not offered Anderson any material reward for his testimony but that it was "a partial answer" that he had told Anderson in Tracy that if he needed anything to let him know. He also admitted that, in talking with Anderson at Tracy, he had made a remark that he might be able to get Anderson a job as a welder after he had gotten out of prison.

Claude N. Stearley, a correctional counselor at Deuel Vocational Institution, called as a witness for petitioner, testified that he had been the correctional counselor for both Anderson and Devins during the summer of 1971. He testified generally regarding the fact that Anderson had given statements both to representatives of the Los Angeles County District Attorney's office and to petitioner and his investigator, Fred Mitchell. Mr. Stearley was not present when petitioner and Mr. Mitchell talked with Anderson. He was present when Anderson signed the September 29, 1971, declaration, but he had no personal knowledge whether petitioner or Mr. Mitchell had made any promises or threats to Anderson in order to obtain the statements which they obtained. Mr. Stearley testified that Anderson was due to have a parole hearing some time in August 1971 and that it was during the latter part of July that Anderson had had Mr. Stearley contact the Los Angeles County District Attorney's office to furnish evidence regarding his conversations with Devins.

William R. Burnett, an investigator assigned to the Special Investigation Division of the Los Angeles County District Attorney's office, called as a witness for petitioner, testified that he had been involved in an investigation of Thomas Utter (Devins) during the years 1968-1969 and that he and a Mr. Lightner from the district attorney's office had interviewed Anderson at Deuel Vocational Institution on August 24, 1971.

The People rested without calling any witnesses. The People introduced into evidence a single exhibit, a subpena, dated April 23, 1970, listing witnesses for the defense at petitioner's trial. It was stipulated that the witnesses listed were all known to petitioner at the time of his trial.

In his objections to the referee's findings, petitioner makes the following contentions: (1) The referee refused to exercise his discretion concerning immunity for Anderson; (2) the referee unduly restricted petitioner's presentation of evidence concerning extrajudicial statements of Anderson; (3) the referee unduly restricted petitioner with respect to introducing evidence of prior acts of misconduct regarding Devins; and (4) the referee's findings are not supported by the record and contain distortions of fact. These objections will be hereinafter discussed in the order in which they were made by petitioner.

*Petitioner's Contention That the Referee Refused to
Exercise His Discretion Concerning Immunity for Anderson.*

■ Upon Anderson's exercising the Fifth Amendment with respect to certain questions propounded to him at the evidentiary hearing, petitioner unsuccessfully sought to have the Attorney General request immunity for Anderson. The basis for the Attorney General's refusal to do so was that the applicable statute, section 1324 of the Penal Code, does not authorize such an immunity.[9] The Attorney General's refusal to

---

[9]Section 1324 of the Penal Code reads: "(a) In any felony proceeding, in any investigation or proceeding before a grand jury for any felony offense, or in any investigation of a criminal organization or organized crime and its activities conducted by the Attorney General, if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby, and if the district attorney of the county or the Attorney General in writing requests the superior court for that county to order that person to answer the question or produce the evidence, a judge of the superior court shall set a time for hearing and order the person to appear before the court and show cause, if any, why the question should not be answered or the evidence produced, and the court shall order the question answered or the evidence produced unless it finds that to do so would be clearly contrary to the public interest, or could subject the witness to a criminal prosecution in another jurisdiction, and that person shall comply with the order. After complying, and if, but for this section, he would have been privileged to withhold the answer given or the evidence produced by him, that person shall not be prosecuted or subjected to penalty or forfeiture for or on account of any fact or act concerning which, in accordance with the order, he was required to answer or produce evidence. But he may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt committed in answering, or failing to answer, or in producing, or failing to produce, evidence in accordance with the order.
"(b) As used in this section, 'criminal organization' means the formation into a functioning whole of a group of people unified for the purpose of performing together, through planning and coordination of individual effort, continuing activities, a substantial portion of which activities are illegal. Indicative that a group of persons constitutes a criminal organization are the following important, though not indis-

request immunity was entirely proper, the proceeding not being one in which he is authorized by the statute to request immunity.

After the Attorney General refused to request immunity for Anderson, petitioner requested the referee to grant immunity on the theory that he had inherent judicial power to do so, but the referee refused. ■ Although the present proceeding is not a felony proceeding (see *France* v. *Superior Court*, 201 Cal. 122, 126-127 [1] [255 P. 815, 52 A.L.R. 869]), petitioner now urges that it should be treated as one and that the referee should be deemed to have had the power to grant immunity. Whether or not the proceeding is treated as a felony proceeding, however, is immaterial, because in any event the written request of either the district attorney of the county or the Attorney General is required under the statute, and neither of those officers requested that immunity be granted.

■ It was undoubtedly within the power of the Legislature to make the grant of immunity conditional upon a request of the district attorney of the county or the Attorney General, the power to provide for the exercise of a grant of immunity being essentially a legislative function. (See *Kastigar* v. *United States*, 406 U.S. 441, 445-447 [32 L.Ed.2d 212, 217-218, 92 S.Ct. 1653]; *People* v. *Traylor*, 23 Cal.App.3d 323, 332 (7) [100 Cal.Rptr. 116].) Making a grant of immunity subject to a request therefor by the district attorney of the county or the Attorney General does not invade judicial prerogatives, since the decision to seek immunity is an integral part of the *charging* process, and it is the prosecuting attorneys who are to decide what, if any, crime is to be charged. (*People* v. *Sidener*, 58 Cal.2d 645, 650 [25 Cal.Rptr. 697, 375 P.2d 641].) As a result, the principle here involved differs from that existing in both *Esteybar* v. *Municipal Court*, 5 Cal.3d 119 [95 Cal.Rptr. 524, 485 P.2d 1140]; and *People* v. *Tenorio*, 3 Cal.3d 89 [89 Cal.Rptr. 249, 473 P.2d 993], on which petitioner relies. In those cases, the Legislature had attempted to authorize the prosecutor to prevent the exercise of a judicial power by withholding consent to an act which a judicial officer would otherwise have taken.

*Petitioner's Contention That the Referee Unduly Restricted Petitioner's Presentation of Evidence Concerning Extra-Judicial Statements of Anderson.*

As hereinabove pointed out, Anderson made a number of out-of-court

---

pensable, factors: the continuation of activity by the organization, though its personnel may change, and the formation of lines of authority in which responsibility is delegated and duties are assigned.

"(c) As used in this section, 'organized crime' means criminal organizations and their activities."

statements. Thus, in a declaration made on September 29, 1971, Anderson stated that Devins had admitted framing petitioner by committing perjury at the latter's trial. On October 14, 1971, Anderson repudiated the September declaration, but a month later he repudiated the October declaration and reaffirmed the truth of his September declaration. When Anderson, by invoking the privilege against self-incrimination, became unavailable as a witness, petitioner sought to introduce evidence of Anderson's various declarations, as well as evidence of hearsay statements made by Anderson to third persons regarding statements allegedly made to him by Devins while the two were cellmates.

The basic question is whether or not Anderson's declaration of September 29, 1971, was admissible as a statement against interest under section 1230 of the Evidence Code. If not, none of the other evidence referred to would be admissible to attack or support Anderson's credibility as a hearsay declarant.

Section 1230 of the Evidence Code reads: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

Although Anderson clearly was "unavailable as a witness" (Evid. Code, § 240), the other criteria set by section 1230 of the Evidence Code have not been met. One criterion of admissibility specified by section 1230 of the Evidence Code is that the declaration be such that, when made, the statement must have "created . . . a risk of making [the declarant] an object of hatred, ridicule, or social disgrace in the community." Petitioner argues that by relating what Devins had told him while they were cellmates, Anderson became a "snitch" within the prison community; that by "snitching" on Devins, "Anderson assumed the risk of the ultimate sanction"; and that his September declaration is therefore admissible under section 1230 of the Evidence Code.

Nothing in the content of Anderson's statement reflects adversely on his character in such a way as to guarantee that it is reliable. The statement reveals nothing with respect to Anderson's character. He merely

related certain hearsay statements of Devins. But in order for a declaration to be against the declarant's social interest to such an extent that it becomes admissible under section 1230 of the Evidence Code, both the content of the statement and the fact that the statement was made must be against the declarant's social interest. Otherwise, each time a witness broke a confidence, he could claim that his revelations were against social interest, because by betraying the trust placed in him, he had incurred social opprobrium.

The rule is stated by Wigmore, as follows: "It must be remembered that it is not merely the statement that must be against interest, but the *fact stated*. It is because the fact is against interest that the open and deliberate mention of it is likely to be true. Hence the question whether the *statement* of the fact could create a liability is beside the mark." (5 Wigmore, Evidence (3d ed. 1940) § 1462, p. 269; see also *People* v. *Traylor, supra,* 23 Cal.App.3d 323, 329-331.)

Furthermore, Anderson actually cannot be regarded as a "snitch" in the usual sense of one who informs on another inmate to the authorities; and although his statement of what Devins told him reflected adversely on Devins and may have caused Anderson to incur the hatred of Devins and his immediate friends, the statement at the same time served to benefit petitioner, who was another convicted felon. Consequently, even within the prison community Anderson's statement could just as well be regarded as having had the effect of holding him up to approbation.

Lastly, it cannot be said that a reasonable man in Anderson's position would not have made the statement without believing it to be true. Inmates of prisons may have various motives for making false statements, not the least of which is a possible desire to curry favor with the authorities. In this state, it is settled that the offer of a witness, after trial, to retract his sworn testimony is to be viewed with suspicion. (*People* v. *Redmond,* 246 Cal.App.2d 852, 864 [9] [55 Cal.Rptr. 195]; *People* v. *Langlois,* 220 Cal.App.2d 831, 834 [3b] [34 Cal.Rptr. 116].) The testimony of a fellow prisoner who claims that he heard a retraction is even more unworthy of belief. (*People* v. *Sawyer,* 256 Cal.App.2d 66, 80 [63 Cal.Rptr. 749].)

Under the circumstances, the referee was correct in concluding that Anderson's declaration was inadmissible as a declaration against social interest. The additional statements offered were, therefore, likewise inadmissible to support or attack Anderson's credibility under section 1202 of the Evidence Code.

*Petitioner's Contention That the Referee Unduly Restricted Him With Respect to Introducing Evidence of Prior Acts of Misconduct Regarding Devins*

As hereinabove pointed out, Devins was also known as Thomas Utter; and it was under that name that he was prosecuted for the offenses of which he was subsequently found guilty. *People* v. *Utter,* 24 Cal.App. 3d 535 [101 Cal.Rptr. 214], is Devins' appeal from his conviction. In the present proceeding, petitioner sought to introduce in evidence the entire opinion in *Utter,* including the facts stated therein, on the ground that the referee was empowered to hear traditional forms of evidence bearing on the question of credibility and that since Devins had denied statements attributable to him, his credibility was in issue.

Petitioner suggested to the referee at the evidentiary hearing that such evidence should be received under either section 1101, subdivision (b), or section 1103 of the Evidence Code. Those sections, however, do not apply to render the evidence admissible; and since the requirements of section 1291 of the Evidence Code could not be met, petitioner was not entitled to introduce at the evidentiary hearing the reported testimony of witnesses at Devins' trial.

In any event, even though the referee refused to take judicial notice of the facts as reported in *Utter,* petitioner was not precluded from subpenaing any of the witnesses to testify at the evidentiary hearing if he could establish that they would give testimony constituting "newly discovered evidence."

*Petitioner's Contention That the Referee's Findings Are Not Supported by the Record and Contain Distortions of Fact*

As hereinabove indicated, the referee found, among other things, that no new credible evidence had been discovered by petitioner undermining the case presented by the prosecution at petitioner's trial. Although we are not required to adopt the referee's findings (*In re Anderson,* 6 Cal.3d 288, 297 [98 Cal.Rptr. 825, 491 P.2d 401]), we have concluded that they are amply justified by the record, and we adopt them.

Petitioner argues that the referee took a "jaundiced view" of the record. He is especially critical of the referee, because the latter did not, in summarizing the evidence, go into detail with respect to Anderson's declarations, which were determined by the referee to be inadmissible. There was, however, no necessity for the referee in his findings to elaborate on inadmissible evidence, and petitioner's contention is devoid of merit.

Petitioner argues strenuously that the referee should have believed the testimony of both Owen and Alexandria. ■ The question of the credibility of the witnesses was one for the referee to determine. In any event, however, the referee's stated reasons for finding that neither of those witnesses should be believed are not only plausible, but are supported by other evidence. For instance, with respect to Owen, it is significant that on the day he claimed petitioner introduced him to Devins in petitioner's office, Devins was equipped with a hidden body tape recorder, and the transcript of the tape does not contain a single reference to Owen, much less an introduction of Owen and Devins by petitioner.

Even if Anderson's extrajudicial statements had been admitted, the prosecution's case at petitioner's trial would not have been undermined, as concluded by the referee, particularly since it would have been almost impossible to discern which, if any, of Anderson's many statements were true. In view of the conflicting evidence hereinabove set forth, petitioner has not shown that he is entitled to habeas corpus relief.

■ In the present case, the "newly discovered evidence" offered by petitioner does not meet either of the tests referred to by this court in *In re Lindley,* 29 Cal.2d 709 [177 P.2d 918]; and *In re Branch,* 70 Cal.2d 200 [74 Cal.Rptr. 238, 449 P.2d 174]. In *Lindley,* this court held that newly discovered evidence does not warrant relief unless it is of such character "as will completely undermine the entire structure of the case upon which the prosecution was based." (P. 723 [7] of 29 Cal.2d 709.) In *Branch,* we later indicated that newly discovered evidence will not undermine the case of the prosecution so as to warrant habeas corpus relief unless (1) the new evidence is conclusive, and (2) it points unerringly to innocence. We there said at pages 214-215 of 70 Cal.2d: "In both cases [*In re Imbler,* 60 Cal.2d 554 [35 Cal.Rptr. 293, 387 P.2d 6]; *In re Lindley, supra,* 29 Cal.2d 709] the evidence presented to establish petitioner's innocence was inconclusive. Neither case involved, as does the instant case, another person's *confession* to the crime and the question of the confessor's credibility. Obviously a confession by another party exonerating the petitioner does point unerringly to petitioner's innocence and, if credited, undermines the entire case of the prosecution." Similarly, here there was no confession by a third person exonerating petitioner and no conclusive evidence pointing unerringly to innocence.

As hereinabove pointed out, the offer of a witness after a trial to retract his sworn testimony is always viewed with suspicion. (*People* v. *Redmond, supra,* 246 Cal.App.2d 852, 864 [9]; *People* v. *Langlois, supra,* 220 Cal.App.2d 831, 834-835 [3b].) Petitioner's evidence was even more

questionable: It consisted of the testimony of a fellow prisoner who claimed to have heard a retraction. The following statement from *People* v. *Sawyer, supra,* 256 Cal.App.2d 66, 80, is accordingly, applicable: "Even where the trial witness himself files a sworn retraction, the trial judge may weigh its credibility and reject it if he deems it unworthy of belief. [Citation.] Here the retraction was offered by one who claimed to have overheard the witness, while the witness himself denied the retraction. In exercising its discretion, the trial court could compare the conflicting statements, consider the likelihood of the claimed retraction in relation to the circumstances in which it was allegedly made and in the light of the trial evidence, then decide that it was unworthy of belief. Its decision was well within the bounds of discretion."

The present case is distinguishable from *People* v. *Williams,* 57 Cal.2d 263 [18 Cal.Rptr. 729, 368 P.2d 353]. In *Williams,* the sole evidence of the defendant's guilt was the testimony of a single witness. The testimony was uncorroborated, and subsequently four unbiased persons executed affidavits which provided the defendant with a complete defense, in that they refuted in its entirety the testimony of the witness at the trial. In the present case, on the other hand, there was corroboration for Devins' testimony, while Owen's testimony merely raised an issue of credibility without providing petitioner with a complete defense establishing innocence.

The order to show cause is discharged, and the petition for writ of habeas corpus is denied.

Wright, C. J., Tobriner, J., Mosk, J., Burke, J., Sullivan, J., and Clark, J., concurred.