Filed 3/27/14  P. v. Mace CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> WILLIAM THOMAS MACE, <br><br> Defendant and Appellant. | D061642 <br><br><br> (Super. Ct. No. SCS233695) |

APPEAL from a judgment of the Superior Court of San Diego County, Stephanie Sontag, Judge.  Affirmed.

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, William M. Wood and Amanda E. Casillas, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

# INTRODUCTION

Defendant William Thomas Mace appeals from a judgment of conviction after a jury trial. Mace was convicted of one count of murder and two counts of attempted murder in connection with a freeway shooting.

On appeal, Mace contends that the trial court erred in declining to grant use immunity to one of the other passengers who was in the same vehicle as Mace at the time Mace shot at another vehicle. According to Mace, this witness's testimony would have corroborated his version of events, and the failure to grant the witness use immunity prejudiced Mace's ability to present his defense of self-defense.

Mace's argument is without merit. The federal appellate authority upon which Mace relies was recently overruled. In any event, even if that authority remained good law, the proffered testimony did not meet the requisite standards. We therefore affirm the judgment of conviction.

# II.

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

On October 12, 2006, Mace was in the front yard of the home where he lived with John Jay Smith and Armando Pelayo when a man arrived who was looking for Pelayo. The man apparently owed Pelayo money for a stolen motorcycle he had purchased from Pelayo and claimed to have the money in Mexico. Pelayo got into the man's vehicle to accompany the man to Mexico to collect the money.

2

Mace felt uncomfortable with the circumstances, so he went next door to tell Miguel Pelayo (Miguel), Armando Pelayo's brother, what was happening. Mace, Smith and Miguel believed that Pelayo was in danger, so they got into Pelayo's silver Hyundai to go after Pelayo and the unidentified man. Miguel grabbed a gun and took it with him into the car.

The group traveled south and eventually saw the red truck with Pelayo and the unidentified man in it. The men in the Hyundai pulled along the side of the red truck and told the driver to pull over. Eventually both vehicles parked in a retail center parking lot.

Mace, who had put the gun in his waistband, and Miguel walked to the truck. They opened the passenger door and told Pelayo to get out. Pelayo ran to the Hyundai and Miguel and Mace exchanged words with the man in the truck. Mace displayed the gun and the man drove off.

Mace returned to the front passenger seat of the Hyundai. Miguel was driving, and Pelayo and Smith were sitting in the backseat. The group drove north on Interstate 5. A witness noticed the Hyundai as he was driving north on Interstate 5. The Hyundai caught the man's attention because the driver appeared to be "messing around" and the car had "fake racing stickers in the window and big old Hyundai racing [] rims." He also noticed that the driver of the Hyundai was driving erratically. At one point the Hyundai "was on the backside of a [red] car," then "backed off and came over and got in front of [the witness] with no turn signals, and then it shot across the lanes to the fast lane." The Hyundai was traveling "at a fairly good speed" as compared with the witness's vehicle, which was traveling at approximately 65 miles per hour.

3

That same day, at approximately 4:30 p.m., Alex Teymoori was giving friends Alan Montano and Jose Roman a ride home from their high school in his white Honda Civic. Montano was in the front passenger seat, and Roman was in the backseat behind Montano.

While driving north on Interstate 5, the boys saw the silver Hyundai occupied by Mace and his friends. The Hyundai had been traveling at a high rate of speed, but it slowed down as it approached the passenger side of Teymoori's Honda. When the Hyundai was next to the Honda, Miguel began to rev the Hyundai's engine loudly and the occupants of the Hyundai stared at the occupants of the Honda. Montano asked Teymoori whether he wanted to race the Hyundai. Teymoori did not want to race, so Montano indicated to the occupants of the Hyundai that they did not want to race by gesturing with his right hand back and forth across his neck.

At that point, the occupants of the Hyundai began "displaying hand gestures and banging on the windows" of the Hyundai. Montano responded by sticking his hand out of the window and gesturing with his middle finger toward the Hyundai. Teymoori then drove away from the Hyundai.

A short time later, Teymoori saw the Hyundai in his rearview mirror. Montano observed the Hyundai move from the far left lane on the interstate all the way across the other lanes. Both vehicles merged onto Highway 54. At that point, the Honda was in the far left lane, and the Hyundai was in the lane immediately to the right of the Honda. The occupants of the Hyundai continued to make hand gestures and "taunt" the boys in the Honda. At some point, Mace smiled and/or smirked, and brandished the gun. Mace held

4

the gun in front of his face, moving it from side to side. Montano saw the firearm and yelled, "Gun[!]" Montano tucked his head between his legs. When Montano indicated that there was a gun, Teymoori applied the Honda's brakes, and Montano felt his body thrust forward.

Teymoori believed that he saw Mace shoot five or six rounds at him and his friends. Montano heard three or four shots, and heard glass breaking. Montano also heard "bits of laughter" coming from the Hyundai as it sped away.

Teymoori noticed that the rear passenger side window of the Honda was shattered, and that Roman had been shot. Teymoori "pulled over to the middle median" of the highway. Montano and Teymoori got out of the Honda and flagged down a passerby to seek help.

Rebecca Beacom saw "two boys standing outside their car signaling down somebody for help." Beacom stopped, and upon seeing the bullet holes in the Honda, called 911. Another driver, Leticia Barragan, saw "a young boy waving with his hands . . . jumping, desperate, asking for some help." Barragan pulled over. After approaching the Honda and seeing Roman slumped over, she also called 911.

California Highway Patrol Officer Robert Smith was the first emergency responder to arrive at the scene. Smith found Roman "slumped to the left" in the back seat of the Honda, and noted that Roman "had a puncture wound on his right side." A police investigation into the shooting revealed that the Honda had been hit by four bullets. Three of the bullets entered the vehicle through the rear passenger side window. Bullet trajectory evidence presented at trial demonstrated that one of these three bullets

5

had lodged in Roman's torso. The fourth bullet entered the Honda through the front passenger side open window. Roman died from the bullet wound to his torso.

Appellant was not immediately apprehended. However, in February 2007, an El Cajon police officer who was working an unrelated investigation recovered a Glock .40-caliber firearm that was determined to have been the weapon used in Roman's homicide. In late 2009, investigators interviewed Mace regarding this case. During the interview, Mace admitted his guilt, stating that he knew that the gun that police had recovered connected him to the shooting of the occupants in the Honda. Mace offered to provide information regarding other criminal activity in exchange for a more favorable outcome in this case.

At trial, Mace testified in his own defense. Mace claimed that the occupants of the Honda were trying to race the occupants of his car, but that none of the occupants of the Hyundai wanted to race. Mace admitted that he shot at the Honda, and that he was the person who shot Roman. However, he contended that he had fired the gun in self-defense. According to Mace, he believed that Montano was reaching for something to use to attack Mace and his friends. Mace also testified that Teymoori had tried to run the Hyundai off the road multiple times.

Mace admitted, however, that neither he nor his friends were in imminent danger at the time he fired the gun at the Honda. He also admitted that he fired the gun before he could determine whether Montano was actually reaching for something.

6

B.      *Procedural background*

Mace was charged with one count of murder as to Roman (Pen. Code, § 187, subd. (a); count 1)[1] and two counts of attempted murder as to Teymoori (§§ 664 & 187, subd. (a); count 2) and Montano (§§ 664 & 187, subd. (a); (count 3).)  With respect to count 1, the information alleged that Mace personally used a firearm within the meaning of section 12022.5, subdivision (a), and that Mace caused great bodily injury and death to a person within the meaning of section 12022.53, subdivision (d).  With respect to counts 2 and 3, the information alleged that Mace personally used and intentionally discharged a firearm (§§ 12022.5, subd. (a), 12022.53, subds. (b)&(c)).

A jury convicted Mace on all counts and found all of the enhancement allegations true.

The trial court sentenced Mace to an indeterminate term of 25 years to life in state prison for the murder conviction, and an additional indeterminate term of 25 years to life in state prison for the true finding on the death-by-a-firearm allegation, for a total indeterminate term of 50 years to life.  As to both counts 2 and 3, the court sentenced Mace to an indeterminate term of seven years to life in prison, to run concurrently with the sentence on count 1, plus a determinate term of 20 years, to run concurrently with the sentence on count 1.

---

1       Further statutory references are to the Penal Code unless otherwise specified.

Mace filed a timely notice of appeal.[2]

## III.

## DISCUSSION

A.  *The trial court did not err in denying Mace's request to grant immunity to Armando Pelayo*

Mace contends that the trial court erred in denying his request to grant judicial immunity to defense witness Armando Pelayo. According to Mace, Pelayo's testimony would have bolstered Mace's claim that he shot in self-defense, and was necessary to Mace's defense.

1.  *Additional background*

At trial, Pelayo was called as a defense witness. On the advice of his counsel, Pelayo invoked his Fifth Amendment right against self-incrimination. Mace moved the trial court to grant judicial immunity to Pelayo. The prosecutor opposed the motion. The prosecutor informed the court that Pelayo had provided prior inconsistent statements to law enforcement officials, and that the prosecution would use those statements to impeach Pelayo, if necessary. Specifically, when initially interviewed, Pelayo had denied any knowledge of the shooting and denied being in the vehicle at the time Mace shot at the Honda.

Defense counsel proffered that Pelayo would testify in a manner similar to a recorded interview between Pelayo and defense counsel that had taken place approximately 16 days before Mace's trial. During that interview, Pelayo stated that

---

[2]  Mace actually filed two timely notices of appeal.

while he was in the Hyundai, Teymoori, in the Honda, attempted to run the Hyundai off the road. However, Pelayo also said during this interview that he did not "really remember that much" about what happened on the day in question. Pelayo said that he had seen someone in the Honda pull what looked like a gun, but he did not remember seeing Mace shoot at the Honda. At a later point in the interview, Pelayo retracted, to some extent, his comments about seeing a gun pulled by someone in the Honda, and said that he could not really tell "what it was, if it was a weapon or what it was."

The trial court declined to extend judicial use immunity to Pelayo, finding that Pelayo's testimony was not essential to Mace's defense.

2.      *Analysis*

"It is settled in California that the granting of transactional immunity is conditioned upon a written request by the *prosecutor* that the witness be compelled to answer." (*People v. Hunter* (1989) 49 Cal.3d 957, 973 (*Hunter*) (italics added), citing § 1324 and *In re Weber* (1974) 11 Cal.3d 703, 720.) Mace argues that the defendant in a criminal action should be entitled to have the *court* grant use immunity to a defense witness who has knowledge of essential, exculpatory evidence.[3]

Relying on *Hunter*, *supra*, 49 Cal.3d at page 974, and *Government of the Virgin Islands v. Smith* (3d Cir. 1980) 615 F.2d 964, 970-971 (*Smith*), Mace contends that there

---

3      Use immunity protects a witness only against the actual use of his compelled testimony, as well as the use of evidence derived therefrom. Use immunity may be contrasted with transactional immunity, which protects the witness against all later prosecutions relating to matters about which he testifies. (*Kastigar v. United States* (1972) 406 U.S. 441, 449-453, 460; *People v. DeFreitas* (1983) 140 Cal.App.3d 835, 837.)

exists a justification for granting judicial use immunity to a defense witness where the defendant has a " 'due process right to have clearly exculpatory evidence presented to the jury, at least where there is no strong countervailing systemic interest which justifies its exclusion . . . .' [Citation.]" (*Smith*, *supra*, at p. 970.) Mace's argument fails for two reasons: (1) *Smith*, the only authority that supported Mace's position that the judiciary has the power to grant use immunity, was recently overruled, and there is thus no authority to support the notion that a trial court may grant use immunity to a defense witness; and (2) even if *Smith* remained good law and was binding (or even persuasive) authority, the proffered testimony did not meet the requirements of the *Smith* test.

   a.  Smith *is no longer good law*

The Third Circuit of the United States Courts of Appeals was, until recently, the only court to have specifically held that the judiciary has inherent power to grant use immunity to a defense witness for whom the executive branch has declined to do so. (See *Smith*, *supra*, 615 F.2d 964.) However, in August 2013, that court overturned its holding in *Smith*, and concluded that the judiciary does not have the inherent power to grant use immunity to a witness:

> "No statute or Supreme Court ruling authorizes judicial grants of immunity for a defense witness (called for convenience judicial use immunity). We are the only Court of Appeals that permits a trial court to immunize a defense witness. Every other Court of Appeals has rejected this theory of judicial power. Today we do so as well, and overturn that part of *Smith* that recognizes judicial grants of immunity. Immunity is a statutory creation, bestowed by Congress on the Executive Branch through the federal witness immunity statute, 18 U.S.C. §§ 6002, 6003. The decision to immunize a witness to obtain his testimony is a core prosecutorial function, as immunizing necessarily involves weighing the public's need for

10

testimony against the risk that immunity will inhibit later prosecution of criminal wrongdoing. We, in our corner of the Judiciary, now step away from our reach into this prosecutorial realm." (*United States v. Quinn* (2013) 728 F.3d 243, 247.)

The legal basis for Mace's argument that the trial court erred in denying judicial use immunity to Pelayo has thus been overruled. Further, there is absolutely no independent authority from California courts that would support Mace's position.[4] The absence of any authority to support the notion that the judiciary has the inherent authority to grant use immunity is reason enough to reject Mace's argument on appeal. However, even if *Smith* remained valid authority to support Mace's contention that judicial use immunity is available, we would nevertheless affirm the trial court's judgment on the ground that the proffered testimony does not meet the requirements of the *Smith* test.

      b.      *Even if* Smith *remained good law, the proffered testimony was not clearly exculpatory or essential*

Although we do not agree with Mace that a defendant has the right to compel a trial court to grant use immunity to a defense witness, particularly in light of the lack of any remaining authority to support such a position, we nevertheless conclude that even if

---

4     Although Mace suggests that the California Supreme Court adopted the *Smith* test in *Hunter, supra,* 49 Cal.3d at page 973, our review of that case establishes that the *Hunter* court did not in fact adopt *Smith*. Rather, in *Hunter*, the Supreme Court specifically noted that the vast majority of federal and state judicial authority, including authority from California, has rejected the idea that trial court has the inherent power to confer use immunity on a defense witness. (*Hunter*, *supra*, at p. 975.) Further, the *Hunter* court specifically declined to decide whether a court may confer such immunity under the appropriate circumstances. (*Ibid*.) The *Hunter* court merely applied the *Smith* test to demonstrate that even if *Smith* were applicable, the defendant's case would fail. (*Hunter*, *supra*, at pp. 973-975.) We do the same here.

11

*Smith*, *supra*, 615 F.2d 964, remained good law and presented binding or persuasive authority, the *Smith* test would provide Mace no relief.

Under *Smith*, in order to establish that judicial use immunity is warranted in a particular case, a defendant must demonstrate to the trial court that (1) the proffered testimony is clearly exculpatory; (2) the testimony is essential; and (3) there is no strong, countervailing government interest against the granting of immunity. (*Smith*, *supra*, 615 F.2d at p. 972.) Thus, under the *Smith* test, immunity would be denied if the proffered testimony is ambiguous, not clearly exculpatory, cumulative or relates solely to the credibility of the government's witnesses. (*Ibid*.)

Pelayo's testimony was not "clearly exculpatory." First, the circumstance of the interview that formed the basis of his proffered testimony was a leading interview with defense counsel. Even if Pelayo would have testified consistently with what he said during this interview, however, Pelayo had made a number of prior inconsistent statements about what had occurred that day, and the prosecution would have impeached him with, at a minimum, his prior statements that he was not present at the scene of the murder. Further, Pelayo's testimony was not essential to Mace's defense. Pelayo's testimony would have simply been a rehashing of Mace's testimony. Although Mace argues that Pelayo's testimony would have bolstered Mace's testimony, this is not a sufficient reason to compel use immunity. Rather, under *Smith,* the proffered testimony must not be cumulative (see *Smith*, *supra*, 615 F.2d at p. 972); testimony offered to bolster the defendant's own testimony because of its similarity is cumulative by its nature.

12

Even if the *Smith* test were still good law and could provide authority to support a trial court granting use immunity, Pelayo's testimony would not satisfy the test. The trial court therefore did not err in denying Mace's request to grant Pelayo use immunity in order to allow him to testify freely at Mace's trial.

IV.

DISPOSITION

The judgment of the trial court is affirmed.

AARON, J.

WE CONCUR:

NARES, Acting P. J.

O'ROURKE, J.