[No. A056548. First Dist., Div. Four. June 29, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
DAMON L. COOKE, Defendant and Appellant.

## COUNSEL

Mark D. Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Michael E. Banister, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ANDERSON, P. J.**—The court found defendant Damon L. Cooke (appellant) guilty of attempted murder with premeditation while armed with and

using a firearm. The main issue raised by this appeal is whether the trial court violated appellant's due process rights by denying judicial use immunity to an exculpatory defense witness who had invoked his Fifth Amendment privilege not to testify. A second issue raised by the appellant personally is whether there was substantial evidence to support the conviction of attempted murder.

## FACTS

The victim, Padraic Ryan, and a friend of appellant, Alexander Bush, testified for the prosecution. Appellant and Ryan were partners in a bank fraud operation. The two would enlist a third party to open a bank account using a fraudulent payroll check. Over the next two or three days, appellant and Ryan would drive that person to different branches and have him or her cash as many checks as possible on the new account before the bad check failed to clear.

In February 1991 Ryan came down from his home in Berkeley to visit appellant in Los Angeles. On February 12 they visited several banks, accompanied by a third party accomplice (whose identity is unknown) as well as Bush and another friend of appellant, Steve Huynh. Bush drove the third party around; Huynh was merely "along for the ride." Ryan and appellant divided their shares of the money. According to Ryan, he and appellant argued over how Ryan would get back to appellant's apartment so that Ryan could retrieve his wallet. Ryan eventually borrowed appellant's girlfriend's car and drove alone to appellant's apartment. He picked up his wallet, then drove to the airport and flew back to San Francisco. That evening, appellant noticed that his necklace, worth $10,000, was missing from his apartment. Appellant suspected that Ryan took the necklace when he was alone in the apartment.

Appellant, Bush, Huynh and appellant's cousin, Leandre Cooke, drove that night to Ryan's apartment in Berkeley in order to carry out bank fraud the next day in San Francisco. Ryan was home with a friend, Kevin Jefferson. While Ryan and Jefferson were in San Francisco visiting banks, appellant and his friends searched Ryan's apartment for the missing necklace. They did not find it, so they sat and watched television while they waited for Ryan and Jefferson to return. In the meantime, Leandre Cooke showed the others a .38-caliber revolver that he was carrying.

Ryan and Jefferson returned to the apartment. Ryan and appellant went into the bedroom, where Ryan explained what had happened that day and they divided the money. Then Jefferson left the apartment, followed soon

after by the others, leaving Ryan alone. Jefferson agreed to meet appellant in a restaurant parking lot to discuss the bank frauds. According to Bush, Jefferson told appellant that Ryan and he had been to more banks that day than Ryan had previously mentioned to appellant. Appellant asked Jefferson whether he knew if Ryan had taken the necklace. Jefferson said he didn't know. Bush testified that the group briefly discussed how to retaliate against Ryan for taking the necklace and for withholding funds and information, but came to no conclusion.

Appellant, Leandre Cooke, Bush and Huynh returned to Ryan's apartment. Appellant accused Ryan of stealing his necklace. Ryan denied it. Appellant also accused Ryan of cheating him out of $500 that day. They argued, and then, at Ryan's suggestion, appellant asked his girlfriend in Los Angeles over the telephone whether she had found the missing necklace. She said no. Appellant and Ryan argued more, and then appellant asked Leandre Cooke, "Do you have that?" Leandre Cooke took out the revolver and handed it to appellant. Appellant said to Ryan, "Let's go for a ride," to which Ryan responded, "No. If you're going to shoot me, shoot me in my apartment." After a brief exchange of words, appellant raised the gun and either checked the cylinder, or the cylinder fell open. Appellant closed the cylinder, raised the gun to shoulder height and aimed at Ryan's head. (The two were standing four or five feet apart.) Then appellant shot Ryan in the head. Ryan fell to the floor. After everyone else left, Ryan got up, locked the door and dialed 911. He noticed that his bank fraud money was gone.

Appellant gave a different account of the incident. He testified that he came to Berkeley with his friends to go to a concert. He first realized that his chain was missing when he was paged by his girlfriend on the afternoon after he had arrived in Berkeley. Appellant claimed that during his phone conversation with his girlfriend he said, "What's missing," making no mention of the necklace, and that Ryan then blurted out, "I didn't take your chain." Ryan became quite agitated, and Leandre Cooke pulled out a gun. Appellant was afraid that Leandre Cooke would shoot Ryan, so he went over to Leandre Cooke and said, "Give me that damn gun. What is wrong with you?" Appellant obtained the gun, and then Ryan rushed at him and tried to grab it. A struggle ensued, and the gun discharged. Appellant dropped the gun and then he and his friends ran, frightened.

Both Ryan and Bush were witnesses for the prosecution. Ryan had been offered statutory transactional immunity by the district attorney, pursuant to Penal Code[1] section 1324. Bush did not receive immunity; he expected probation pursuant to a previous negotiated disposition.

---

[1]All further statutory references are to the Penal Code.

Steve Huynh was present at the shooting, and was therefore a percipient witness. The defense subpoenaed Huynh to testify at trial. Huynh invoked his Fifth Amendment privilege not to testify, and the district attorney declined to grant Huynh statutory transactional immunity. The court then heard in camera what Huynh's testimony would be and concluded that the testimony "is certainly cumulative [of other evidence], that it is exculpatory but it's exculpatory in its cumulative sense." The court refused to take further steps to grant Huynh immunity, and as a result Huynh did not testify at appellant's trial. Appellant was subsequently convicted of attempted murder with premeditation while armed with and using a firearm, and was sentenced to life imprisonment with the possibility of parole, plus a four-year midterm enhancement for the firearm use.

## I.

Appellant argues that the trial court erred in denying Huynh judicial use immunity.[2] ██ ██ If the court had granted Huynh immunity after the in camera hearing,[3] then Huynh could no longer claim the privilege not to testify. Huynh's testimony, appellant argues, would corroborate appellant's own testimony. As such it was exculpatory and supported the credibility of appellant's testimony. Therefore, it was not cumulative.

Under California law, a witness may not be prosecuted for any act about which he or she was required by the district attorney to testify. (§ 1324.) In addition to broad transactional immunity, there is also "use immunity"—"[i]mmunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom . . . ." (*Kastigar* v. *United States* (1972) 406 U.S. 441, 453 [32 L.Ed.2d 212, 222, 92 S.Ct. 1653].) Use immunity does not afford protection against prosecution, but merely prevents a prosecutor from using the immunized testimony against the witness. Use immunity provides sufficient protection to overcome a Fifth Amendment claim of privilege. Transactional immunity is not constitutionally required. (*Ibid.*)

The district attorney in this case did not request immunity for Steve Hyunh. California law clearly conditions a grant of transactional

---

[2]Although the witness requested "full" immunity, i.e., transactional immunity, section 1324 is the exclusive procedure for granting such a request and that may only be granted upon the request of the People. Since section 1324 does not provide for an in camera hearing, the court most certainly was not acting pursuant thereto. Because the court cited *People* v. *Hunter* (1989) 49 Cal.3d 957 [264 Cal.Rptr. 367, 782 P.2d 608] and *Government of Virgin Islands* v. *Smith* (3d Cir. 1980) 615 F.2d 964, we construe its actions as implying its authority to grant use immunity as discussed therein.

[3]This procedure was not used in *People* v. *Hunter, supra,* 49 Cal.3d at page 973; the issue of whether to grant use immunity was decided on the basis of an offer of proof, which we deem to be sufficient.

immunity on a written request by the prosecutor. (§ 1324; see *People* v. *Hunter* (1989) 49 Cal.3d 957, 973 [264 Cal.Rptr. 367, 782 P.2d 608].) The section 1324 grant of immunity is strictly an executive function, "since the decision to seek immunity is an integral part of the *charging* process, and it is the prosecuting attorneys who are to decide what, if any, crime is to be charged." (*In re Weber* (1974) 11 Cal.3d 703, 720 [114 Cal.Rptr. 429, 523 P.2d 229], italics in original.) Therefore, it is not within the court's power to grant statutory transactional immunity to any witness.

 Appellant claims, however, that a defendant ought to be able to compel the court to grant *use* immunity to a defense witness when that witness's testimony is necessary for the defendant to obtain a fair trial. He acknowledges that the Courts of Appeal have not yet accepted the argument that a trial court has the inherent power to grant a defense witness use immunity independent of the prosecutor's request pursuant to section 1324. Nevertheless, appellant finds hope in language from *Hunter* which notes that "it is possible to hypothesize cases where a judicially conferred use immunity might possibly be necessary to vindicate a criminal defendant's rights to compulsory process and a fair trial . . . ." (*People* v. *Hunter, supra,* 49 Cal.3d at p. 974.)

This language is dicta. The court made it clear that it was not deciding the question of whether or when a court should grant use immunity. (*People* v. *Hunter, supra,* 49 Cal.3d at pp. 974-975.) First, the court explained that it need not decide the issue. Then it discussed the criteria which had been set forth in the sole case clearly recognizing such a right (*Government of Virgin Islands* v. *Smith, supra,* 615 F.2d 964, 972): " '[T]he opportunities for judicial use of this immunity power must be clearly limited; . . . the proffered testimony must be clearly exculpatory; the testimony must be essential; and there must be no strong governmental interests which countervail against a grant of immunity . . . . [¶] [T]he defendant must make a convincing showing sufficient to satisfy the court that the testimony which will be forthcoming is both clearly exculpatory and essential to the defendant's case. Immunity will be denied if the proffered testimony is found to be ambiguous, not clearly exculpatory, cumulative or it is found to relate only to the credibility of the government's witnesses.' " (*People* v. *Hunter, supra,* 49 Cal.3d at p. 974.)[4]

Finally, after reviewing the facts in light of the *Smith* standards, the court concluded, "[E]ven if in appropriate circumstances an essential witness for a

---

[4]Although the Third Circuit, in *Smith, supra,* 615 F.2d 964, held that a court should grant judicial immunity to a witness when it is required for the defendant to obtain a fair trial, the vast majority of the federal courts hold to the contrary. (*United States* v. *Mendia* (9th Cir. 1984) 731 F.2d 1412, 1414; *United States* v. *Alessio* (9th Cir. 1976) 528 F.2d 1079, 1081-1082; *United States* v. *Turkish* (2d Cir. 1980) 623 F.2d 769, 771-777; *United States* v. *Pennell* (6th Cir. 1984) 737 F.2d 521, 527; *United States* v. *Sawyer* (11th Cir. 1986) 799 F.2d

criminal defendant should be granted judicial use immunity—*a question we do not decide*—the record establishes that the circumstances were not appropriate here . . . ." (*People* v. *Hunter, supra,* 49 Cal.3d at p. 975, italics added.)

The People counter that, because *Hunter* "did not expressly decide whether the exception announced in *Smith* would become law in California . . . , the rule in this state is still that expressed in *In re Weber* (1974) 11 Cal.3d 703 [114 Cal.Rptr. 429, 523 P.2d 229]." *Weber* dealt with the scope of section 1324. There, the court approved of the Attorney General's refusal to request immunity at an evidentiary hearing conducted in habeas corpus proceedings by a referee. It also glossed over petitioner's argument that the referee had inherent power to grant immunity, holding that it is within the Legislature's power to condition immunity on a request from the district attorney. (*In re Weber, supra,* 11 Cal.3d at p. 720.) In any event *Weber* is not dispositive because subsequent California courts have exercised their inherent powers to grant use immunity in limited circumstances.

For instance, in *Bryan* v. *Superior Court* (1972) 7 Cal.3d 575, 587 [102 Cal.Rptr. 831, 498 P.2d 1079] the court held that evidence of an admission made by a minor to a juvenile probation officer or to the juvenile court in a fitness hearing could not be introduced against the minor in a criminal prosecution. (See *Ramona R.* v. *Superior Court* (1985) 37 Cal.3d 802, 806 [210 Cal.Rptr. 204, 693 P.2d 789].) The *Ramona* court explained that the purpose of a probation interview " 'is not the marshalling of evidence on the issue of guilt, but rather the assembling of all available information relevant to an informed disposition of the case if guilt is established [citation], or to assist in the evaluation of the minor's fitness for treatment as a juvenile [citation] . . . .' " (*Ibid.*; *In re Wayne H.* (1979) 24 Cal.3d 595, 599 [156 Cal.Rptr. 344, 596 P.2d 1].)

Then in *People* v. *Coleman* (1975) 13 Cal.3d 867 [120 Cal.Rptr. 384, 533 P.2d 1024], the court created the judicial exclusionary rule that evidence derived from a probationer's testimony at a probation revocation hearing is inadmissible against him at a subsequent trial on the related criminal charges, except for impeachment or rebuttal purposes. (*Id.* at p. 889.) The rule applies to direct and derivative use of the testimony. (*Id.* at p. 891.)

The court reasoned that forcing a defendant to choose between the right to testify on his or her own behalf at a probation hearing and the privilege

1494, 1506; *United States* v. *Hunter* (10th Cir. 1982) 672 F.2d 815, 818; *Autry* v. *Estelle* (5th Cir. 1983) 706 F.2d 1394, 1401.) These courts either reject *Smith* outright or hold that it is inapposite to the facts of the case.

against self-incrimination at the upcoming trial was "unnecessarily inconsistent with constitutional values." (*People* v. *Coleman, supra*, 13 Cal.3d at pp. 871-872, 891-892.)

Similarly, in *Tarantino* v. *Superior Court* (1975) 48 Cal.App.3d 465 [122 Cal.Rptr. 61], the Court of Appeal for this district held that a defendant's statement during a psychiatric evaluation to determine the defendant's competence to stand trial may not be used on the issue of guilt in the pending trial. (*Id.* at p. 470.) The court explained that the purpose of the inquiry into mental competency is not to determine guilt or innocence but rather to serve the humanitarian end of ensuring that one mentally unable to defend himself not be tried on a criminal charge. It concluded that "humanitarian and practical considerations call for a judicially declared immunity" that the court found to be reasonably implied from the statutes. (*Id.*, at p. 469.)

And in *Daly* v. *Superior Court* (1977) 19 Cal.3d 132 [137 Cal.Rptr. 14, 560 P.2d 1193] our Supreme Court held that a trial court has the power to issue a protective order granting immunity to a witness in a civil discovery proceeding, but only if the prosecuting officials are notified and fail to object. The court clarified that *Weber*'s holding that the Legislature could properly condition a grant of immunity on the prosecutor's request did not mean that "*any* judicial grant of immunity in the absence of a prosecutor's request constitutes a *judicial* invasion of *executive* prerogatives in violation of the constitutional separation of powers ([Cal.] Const., art. III, § 3)." (*Id.* at p. 146, italics in original.)

The *Daly* court concluded that in the granting of immunity to aid discovery, prosecutorial interests are protected not by a rigid requirement of a prosecutorial request, but by the more general condition that the grant of immunity not "unduly hamper" any subsequent criminal prosecution. (*Daly* v. *Superior Court, supra*, 19 Cal.3d at pp. 146-147.) Technically, use and derivative use immunity do not interfere with prosecution, as long as the evidence used in the witness's subsequent prosecution is not derived from the immunized testimony. But the court was aware that proving that evidence used in the criminal prosecution was independent of the immunized testimony can itself be very difficult. (*Id.* at p. 145.) Therefore, once the prosecutor objects and declares that a grant of immunity might hamper a criminal proceeding, the immunity cannot be granted. The court cannot question the objection because to do so would interfere with prosecutorial discretion. (See *People* v. *DeFreitas* (1983) 140 Cal.App.3d 835, 840 [189 Cal.Rptr. 814] [reiterating that the court cannot question the prosecutor's objection].)

However, *Bryan, Coleman, Tarantino* and *Daly* are distinguishable from the case before us. *Daly* involved a civil proceeding, and the grant of

immunity was conditioned on the prosecution's notification and subsequent failure to object. In this case appellant requests that the court grant *unconditioned* use immunity. The grants of immunity provided for in *Bryan*, *Coleman* and *Tarantino* allow a defendant to testify on other issues relevant to his or her case and still retain protection against self-incrimination at trial. A grant of immunity to a *third party witness*, in contrast, necessarily creates a conflict for the prosecutor. A district attorney who cross-examines a judicially immunized defense witness must narrow his or her questioning to avoid impeding the witness's prosecution, and even then will still face difficulties in proving that the evidence used against that witness was not obtained from or derived from earlier testimony.

Appellant claims that denying use immunity was a due process violation. But the Fifth District Court of Appeal rejected this very argument in *People v. Sutter* (1982) 134 Cal.App.3d 806 [184 Cal.Rptr. 829]. Defendant and Archie Mayhew had been charged with robbery (§ 211). Mayhew had pled guilty but indicated that he would assert his privilege not to testify if called as a defense witness at defendant's trial. He was concerned that his testimony might link him to a second similar robbery that had occurred that same night.

Defense counsel moved the court to grant Mayhew immunity from prosecution for any other crime occurring that evening. The trial court denied the motion. Defendant raised due process and compulsory process arguments on appeal. Note that although the majority deemed the issue waived, it addressed the matter to counter the dissent's position that the court should embrace a doctrine of judicially declared immunity based on constitutional considerations. (*People v. Sutter, supra,* 134 Cal.App.3d at p. 813.)

The *Sutter* court first discussed the due process argument that the government's ability to grant immunity gives it an unfair advantage over the defendant's ability to present a defense. The court found the argument meritless because criminal proceedings have *never* been "symmetrical." (*People v. Sutter, supra,* 134 Cal.App.3d at p. 816.) The "accuser and accused have inherently different roles, with entirely different powers and rights" and so it is nonsensical to argue that certain procedural devices are unfair merely because they put the two sides on unequal footing. (See *United States v. Turkish, supra,* 623 F.2d at pp. 774-775.)

Next, as discussed above, the court noted that judicially granted use immunity substantially burdens the government with having to prove that evidence against a previously immunized witness was not obtained or derived from immunized testimony. (*People v. Sutter, supra,* 134 Cal.App.3d at p. 816.)

The *Sutter* court also suggested that defense witness immunity could easily encourage perjury by codefendants who would seize the opportunity to obtain use immunity for each other and then exculpate each other by claiming responsibility at the other's trial. (*People* v. *Sutter, supra,* 134 Cal.App.3d at p. 817.)

Appellant might argue that these concerns still do not outweigh a defendant's interest in obtaining a fair trial as guaranteed under due process. However, we are persuaded by the Second Circuit's conclusion in *Turkish*: "[W]e simply do not find in the Due Process Clause a general requirement that defense witness immunity must be ordered whenever it seems fair to grant it. The essential fairness required by the Fifth Amendment guards the defendant against overreaching by the prosecutor [citations]. It does not create general obligations for prosecutors or courts to obtain evidence protected by lawful privileges." (*United States* v. *Turkish, supra,* 623 F.2d at p. 777.)

We decline appellant's invitation to declare a doctrine of judicial use immunity for defense witnesses in criminal cases. Although Justice Kaufman can hypothesize cases in which judicially conferred use immunity *to a third party witness* might be necessary to vindicate a defendant's rights, no California Court of Appeal or Supreme Court case has ever granted such immunity to a defense witness, and we will not do so now. The relief which appellant here requests should be granted, if at all, by our state's highest court: We conclude that the trial court did not err by refusing to grant use immunity to appellant's witness.

## II.

■ Appellant also contends that (1) there was insufficient evidence that he had the specific intent to kill Ryan; (2) the indictment failed to allege that the attempted murder was "willful, deliberate, and premeditated"; and (3) even if the indictment were proper, there is insufficient evidence to support a finding that the attempted murder was "deliberate and premeditated."

■ The proper standard of review for a sufficiency of the evidence challenge is explained in *People* v. *Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255] and again in *People* v. *Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643]. The test is whether, on the entire record, a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. The appellate court must view the evidence in a light most favorable to the judgment below and must presume in support of that judgment "the existence of every fact the trier

could reasonably deduce from the evidence." (*People* v. *Johnson, supra*, 26 Cal.3d at pp. 576-577. Although the evidence must be "reasonable, credible, and of solid value," the appellate court need only decide whether there is " 'any substantial evidence, contradicted or uncontradicted.' " (*Id.* at pp. 577-578.)

■ The evidence shows that appellant suspected that Ryan took his necklace from his Los Angeles apartment. When the group was in Berkeley, appellant and the others searched Ryan's apartment for the necklace. Later that day, Ryan's friend Jefferson told appellant and his friends that Ryan had not been honest about the earnings from that day's bank scam. The group discussed how to get even with Ryan for cheating appellant and taking his necklace. One of the options was to "take him up to the highlands and shoot him." Appellant knew then that Leandre Cooke had a gun with him.

After appellant and his friends returned to Ryan's apartment, the appellant confronted Ryan. Appellant asked Leandre Cooke for the gun and tried to get Ryan to "go for a ride." Ryan said, "No. If you're going to shoot me, shoot me in my apartment." Appellant raised the gun and shot Ryan in the head.

From this evidence, a reasonable trier of fact could have found both that (1) appellant had the specific intent to kill Ryan, and (2) the attempted murder was deliberate and premeditated.

Further, although the original indictment did not allege premeditation, the district attorney reconvened the grand jury, which approved an amendment that "the attempted murder alleged above was willful, deliberate and premeditated."

The judgment is affirmed.

Perley, J., concurred.

**POCHÉ, J.,** Dissenting.—In *People* v. *Hunter* (1989) 49 Cal.3d 957 [264 Cal.Rptr. 367, 782 P.2d 608], the California Supreme Court applied the criteria for judicially conferred immunity set forth in *Government of Virgin Islands* v. *Smith* (3d Cir. 1980) 615 F.2d 964, to the facts before them, but found that the defense had failed to show that the proffered testimony was " 'clearly exculpatory and essential' " to the defense. (*People* v. *Hunter, supra*, 49 Cal.3d at p. 974.) In the instant case the trial court applied those same criteria to defendant's offer of proof and found that the defense had failed to show the proffered testimony was not cumulative. It is that ruling

which should be the subject of appellate review. Instead, my majority colleagues launch a frontal attack on *Hunter,* dismissing the Supreme Court's three-page analysis on judicial immunity as dicta, and then deciding the issue on the basis of cases which not only predated *Hunter* but were treated by the Supreme Court as nondispositive. From that analysis I dissent.

Summary dismissal of *Hunter* might be appropriate if that decision had been written differently, for example, if it had been simply a rejection of the contention with citation to the three existing Court of Appeal cases which find no power in the trial courts to grant immunity: *People* v. *Sutter* (1982) 134 Cal.App.3d 806, 812-814 [184 Cal.Rptr. 829], *People* v. *DeFreitas* (1983) 140 Cal.App.3d 835, 839-841 [189 Cal.Rptr. 814], and *People* v. *Estrada* (1986) 176 Cal.App.3d 410, 418 [221 Cal.Rptr. 922].[1]

But the *Hunter* analysis is much more complex. After noting those three cases, Justice Kaufman, speaking for a unanimous court, focused his attention on *Government of Virgin Islands* v. *Smith,* the then sole federal circuit court decision which had recognized the due process implications for the defendant. (*People* v. *Hunter, supra,* 49 Cal.3d at pp. 973-975.)[2] After a full discussion of *Smith* and its holding, he concluded that the defendant's offer

---

[1]Unlike the California Courts of Appeal, the commentators have uniformly advocated the doctrine of judicially conferred immunity, although they have differed on the constitutional compulsion for the doctrine. (See, e.g., Comment, *Defense Witness Immunity and the Right to a Fair Trial* (1980) 129 U.Pa.L.Rev. 377 [due process]; Note, *The Sixth Amendment Right to Have Use Immunity Granted to Defense Witnesses* (1978) 91 Harv.L.Rev. 1266 [Sixth Amendment]; Note, *"The Public Has a Claim to Every Man's Evidence": The Defendant's Constitutional Right to Witness Immunity* (1978) 30 Stan.L.Rev. 1211 [due process]; Note, *Separation of Powers and Defense Witness Immunity* (1977) 66 Geo.L.J. 51; Westen, *The Compulsory Process Clause* (1974) 73 Mich.L.Rev. 71 [Sixth Amendment]; Note, *A Re-Examination of Defense Witness Immunity: A New Use for Kastigar* (1972) 10 Harv.J. on Legis. 74; Note, *Right of Criminal Defendant to the Compelled Testimony of Witnesses* (1967) 67 Colum.L.Rev. 953.)

[2]Worth noting is that the court in *Hunter* did not deem it necessary to cite by name one of the federal cases reaching the opposite conclusion, preferring instead to point the reader to *People* v. *DeFreitas, supra,* 140 Cal.App.3d 835, and to an article in the American Law Review (see Annot. (1981) 4 A.L.R.4th 617). (*People* v. *Hunter, supra,* 49 Cal.3d at p. 972.) Nor did the high court mention the leading Second Circuit case of *United States* v. *Turkish* (2d Cir. 1980) 623 F.2d 769, which had held that the Fifth Amendment does not require that the defense witness immunity "be ordered whenever it seems fair to grant it." (*Id.* at p. 777.) It is curious that my majority colleagues now elect to be "persuaded" by the *Turkish* case when the Supreme Court thought it not worth mentioning. (Maj. opn., *ante,* p. 1370.)

What is even more curious about their reliance on *Turkish* is that, although the Second Circuit has left the immunity decision with the executive branch, it has not left that power unchecked. To the contrary, the Second Circuit has repeatedly recognized the power of the judiciary to force the prosecution to grant immunity to a defense witness when the defense establishes three things: (a) prosecutorial overreaching has forced the witness to invoke the privilege against self-incrimination; (b) the witness's testimony is material, exculpatory and not cumulative; and (c) the defendant has no other way to obtain the evidence. (*United States*

of proof did not measure up to the *Smith* standards for judicially conferred immunity. But analysis did not stop there.

Instead Justice Kaufman proceeded to note the cases which had put limits on the power of the prosecutor to grant immunity, and added, "We agree the prosecutor's duty is to administer the immunity power evenhandedly, with a view to ascertaining the truth, and not as a partisan engaged in a legal game." (*People* v. *Hunter, supra*, 49 Cal.3d at pp. 974-975.) He then specifically referred to a case in which a conviction had been reversed where the government selectively granted immunity to two prosecution witnesses, but refused to grant it to two other critical defense witnesses (*United States* v. *De Palma* (S.D.N.Y. 1979) 476 F.Supp. 775, 780-782) and to the holding in the Third Circuit that the prosecution cannot selectively grant or withhold immunity "with the deliberate intention of distorting the judicial fact finding process" (*United States* v. *Herman* (3d Cir. 1978) 589 F.2d 1191, 1204). (*People* v. *Hunter, supra*, 49 Cal.3d at pp. 974-975.) Not content just to note these doctrines, Justice Kaufman returned to the facts of the case before him and concluded: "there is no evidence here that the prosecutor intentionally refused to grant immunity to a key defense witness for the purpose of suppressing essential, noncumulative exculpatory evidence." (*People* v. *Hunter, supra*, at p. 975.)

Thus my majority colleagues are correct when they say the Supreme Court did not decide whether "in appropriate circumstances an essential witness for a criminal defendant should be granted judicial use immunity." (*People* v. *Hunter, supra*, 49 Cal.3d at pp. 974, 975.) But what is equally true is that the Supreme Court did not instruct the lower courts of this state to hide their heads in the sand and blithely follow *Sutter, DeFreitas* and *Estrada*. When the California Supreme Court devotes such detailed attention to an issue it could have easily rejected outright, those pronouncements deserve respectful attention. Indeed, I read the unmistakable message of *Hunter* to be that the courts of this state should apply the *Smith* guidelines where they fit.

To its credit, the trial court understood that message for it applied the *Hunter/Smith* standards, although it did so incorrectly.

The five *Hunter/Smith* standards are these: immunity must be properly sought in the trial court; the defense witness must be available to testify; the proffered testimony must be clearly exculpatory; the testimony must be essential, meaning it cannot be cumulative or relating only to the credibility

v. *Burns* (2d Cir. 1982) 684 F.2d 1066, 1077; accord, *U.S.* v. *Bahadar* (2d Cir. 1992) 954 F.2d 821, 826; *U.S.* v. *Pinto* (2d Cir. 1988) 850 F.2d 927, 935; *United States* v. *Calvente* (2d Cir. 1983) 722 F.2d 1019, 1025.) The net result is the same as under the *Smith* approach; it is the solution which is different.

of the prosecution's witnesses; and there must be no strong governmental interest which countervails against a grant of immunity. (*Government of Virgin Islands* v. *Smith, supra,* 615 F.2d at pp. 972, 974.)

After an in camera hearing[3] in which the trial court heard the proffered testimony of eyewitness Steven Huynh, the court denied immunity only because it determined that Huynh's testimony was cumulative.[4]

The trial court was simply wrong. Huynh's proffered testimony was anything but cumulative. There were four people in the room at the time of the shooting: defendant, the victim, Bush and Huynh. Bush and Ryan put the blame on defendant; defendant said it was an accident. Huynh alone agreed with defendant. Unless one defines cumulative as including the sole testimony corroborating that of the defendant, Huynh's testimony as a matter of law was not.

Returning to the *Hunter/Smith* elements, nearly all the pins fall easily. Huynh was available to testify. Huynh's testimony was essential to the defense case: it would have corroborated defendant's testimony and directly contradicted the testimony of the government's witnesses. Huynh's testimony was exculpatory. Huynh's testimony was neither ambiguous nor did it relate only to the credibility of the government's witnesses.

However the trial court did not consider the final *Smith* criterion: whether there might be a governmental interest countervailing against a grant of immunity to Huynh. Whether this factor exists cannot be decided in a factual vacuum. While we know that the prosecutor was unwilling to offer Huynh transactional immunity,[5] we do not know whether there might be a good and sufficient reason not to offer him use immunity. Therefore, I would remand to the trial court for purposes of a hearing in which the People would be required to demonstrate a governmental interest countervailing against a

---

[3]Without explanation, the majority also takes issue with the in camera procedure utilized by the trial court here, and states a preference for an offer of proof as was utilized in *Hunter*. (Maj. opn., *ante*, p. 1366, fn. 3.) I can find no fault with either approach.

[4]The trial court said "his offered testimony would be cumulative, that it does not relate only to the credibility of governmental witnesses, and while it is exculpatory, it is not openly, clearly contrary to the evidence that's already before the court."

[5]A final observation. The prosecutor conferred transactional immunity on the victim Ryan, and allowed prosecution witness Bush to enter a plea to a reduced charge in exchange for his testimony. Although no sentence had been promised, Bush hoped to be given three years probation. Despite the fact that Huynh on the other hand was neither charged with a crime in conjunction with this event nor offered transactional immunity, no question was raised as to the prosecutor's motives and no contention of prosecutorial discrimination has been asserted.

grant of immunity to Huynh, and for further proceedings in the event that the People are unable to sustain that burden of proof.

Appellant's petition for review by the Supreme Court was denied September 23, 1993. Mosk, J., Kennard, J., and Arabian, J., were of the opinion that the petition should granted.