**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

DAMON COOKE,

                Petitioner - Appellant,

   v.

JOSE SOLIS, Warden, California Training
Facility - Central; BOARD OF PRISON
TERMS; A. KANE,

                Respondents - Appellees.

No. 06-15444

D.C. No. CV-04-04439-MJJ

OPINION

Appeal from the United States District Court
for the Northern District of California
Martin J. Jenkins, District Judge, Presiding

Argued and Submitted April 16, 2007
San Francisco, California

Submission Vacated August 7, 2007
Resubmitted May 28, 2010

Before: REINHARDT, WARDLAW and M. SMITH, Circuit Judges.

Opinion by Judge REINHARDT:

In 1991, Damon Cooke was convicted of attempted first degree murder. He was sentenced to seven years to life in prison with the possibility of parole, plus a four-year enhancement for using a firearm. In November 2002, the California Board of Prison Terms[1] held a hearing to determine whether Cooke was suitable for parole. At the conclusion of the hearing, the Board denied him parole, relying primarily on the circumstances of the commitment offense.

Cooke sought a writ of habeas corpus in state court, asserting that the Board's decision violated his right to due process. Finding that the Board's decision was supported by "some evidence" of unsuitability, the state courts denied the petition. Cooke then sought a writ of habeas corpus in federal court. The district court denied the petition, and Cooke timely filed a notice of appeal on October 14, 2005.

We now conclude that, under the standard announced in *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc),[2] Cooke is entitled to federal

_____

[1]On July 1, 2005, the California Board of Parole Hearings replaced the Board of Prison Terms. Cal. Penal Code § 5075(a).

[2]*Hayward*, 603 F.3d at 561-63 (holding that federal habeas courts reviewing a due process challenge to the denial of parole in California must determine "whether the California judicial decision approving the [Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" (quoting 28 U.S.C. 2254(d)(1)-(2)). We note that the

habeas relief. Accordingly, we reverse the decision of the district court and remand with instructions to grant the writ.

## I.

## A.

On February 12, 1991, Cooke's friend Padriac Ryan came to visit him at his apartment in Los Angeles. After Ryan returned to his own home in Berkeley, Cooke noticed that a necklace was missing from the apartment.[3]

That night, Cooke traveled from Los Angeles to Berkeley with his cousin LeAndre and his friends Alexander Bush and Steve Huynh. When Cooke and his companions confronted Ryan about the theft of the necklace, Ryan denied responsibility, and an argument ensued. LeAndre pulled out a .38 caliber pistol, which Cooke took from him. Cooke then fired a single shot, which struck Ryan on the right side of the head. Ryan fell to the ground and pretended to be dead, and Cooke, LeAndre, Bush, and Huynh fled the scene.

---

district court did not have the benefit of our en banc decision in *Hayward* when it decided Cooke's petition.

[3]This description of the offense is drawn primarily from the California Court of Appeals' opinion affirming Cooke's conviction. *People v. Cooke*, 16 Cal. App. 4th 1361, 1364-67, 1375 (1993). The opinion states that the missing item was a $10,000 necklace. *Id.* Before the Board, Cooke stated that, in fact, $10,000 in cash *and* a necklace were missing from his apartment.

The shooting was not fatal.[4] After the four men had fled, Ryan got up, locked his door, and called 911. The police stopped Cooke and his companions a few blocks away. Cooke was subsequently arrested and charged with attempted first-degree murder.

On October 2, 1991, Cooke was convicted of attempted first-degree murder with an enhancement for use of a firearm. On December 18, 1991, he was sentenced to seven years to life in prison with the possibility of parole for the attempted murder conviction, plus four additional years for the firearm enhancement.

B.

On November 19, 2002, the California Board of Prison Terms held a hearing to evaluate Cooke's suitability for parole. During the hearing, the Board heard evidence regarding Cooke's life history, his commitment offense, his behavior and achievements while incarcerated, his mental health, and his post-release plans.

With respect to Cooke's background, the Board learned that Cooke had never been arrested prior to the commitment offense. He did not drink or use drugs, and he had never been involved in gang activity. He has close and stable

---

[4]Ryan suffered a fractured cheekbone and partial hearing loss in one ear as a result of the shooting.

relationships with his mother, who is a financial consultant, and his stepfather, who is a retired Los Angeles County Probation Officer.

Cooke attended El Dorado High School in Placentia, California and graduated with a 3.5 GPA. He then enrolled in an ROTC program, through which he attended the New Mexico Military Institute. Thereafter he pursued a degree in finance at the University of New Mexico. During his final year of college, his mother had bypass surgery, and he left school in order to care for her. He later passed the National Association of Securities Dealers exam and began work as a financial consultant.

During his time in prison, Cooke has been both well-behaved and extremely industrious. He successfully completed numerous voluntary self-help and educational programs, including a thirteen-week IMPACT program ("a self-help group designed to provide an opportunity for education and awareness as to the profound negative impact of crime on its victims") and numerous anger and stress management classes. Because only limited self-help and therapeutic programming was offered in the prisons in which he was incarcerated, he took it upon himself to read and write reports about various self-help books. He also participated in various Christian and Buddhist groups, and became an ordained minister. At the time of the hearing, he was in the process of acquiring college credits via

5

correspondence from Coastline Community College, with the hope that the University of New Mexico would accept the credits toward completion of his bachelor's degree in finance.

Cooke has held numerous jobs while in prison, including teacher's aide, education clerk, and personnel clerk. His supervisors have raved about his job performance, extolling his "exceptional[] diligen[ce]," "positive working attitude," "university level writing ability," "astounding ability under duress," "excellent people skills," and "exceptional work" product. They have also noted that he "contributes above and beyond expectations," is a "positive influence on others," "always remains in control of himself," and "shows a great deal of respect towards his peers, and staff alike." A teacher under whom Cooke worked as an aide for almost two years stated that

> His contribution towards the overall success of my academic class . . . was both monumental and unselfish. . . . [He] was an asset to my program because of his ability to retain a positive attitude in the face of adversity. This attribute was and continues to be a rare and seldom attained commodity in the working environment of my chosen profession. His social skills and patience when working with both free staff and inmates was impeccable.

Various corrections officials have noted that Cooke has consistently "go[ne] above and beyond to help his fellow inmates." For several years Cooke has helped to facilitate the prison's literacy and stress management courses. The corrections

6

officer who supervised him in this role noted that Cooke's efforts resulted in a "drastic increase in other inmates' willingness to work and become productive individuals." Cooke also participated in the making of an educational video for juvenile offenders regarding the consequences of criminal activity. The corrections officer who supervised this effort stated that Cooke's "knowledge, insight, and professional demeanor reflects the epitome of the program." Furthermore, "using his skills in the area of computers, [Cooke] was able to establish a self-help curriculum that provided inmates the opportunity to receive basic computer training, and ultimately, receive their General Education Diplomas (GED's)." Cooke has also helped to organize an annual festival for the children of the inmates at Soledad State Prison,"has been an advisor in various anger management groups, . . . works closely with ministry groups . . [and] has been utilized to quell conflicts that have arisen between staff and inmates."

In addition to commending his work performance, volunteer efforts, and impeccable conduct, numerous corrections officers placed notations in Cooke's file expressing their belief that the Board should find him suitable for parole. For example, corrections officers made the following statements:

> "I can honestly say that Inmate Cooke is one of the best mentors and positive Inmate Advisors I have ever experienced in my fifteen (15) year tenure with the California Department of Corrections. I highly

recommend Inmate Cooke for any parole consideration he may be eligible for . . . ."

"Any consideration you may give with regards to inmate Cooke's parole considerations comes with the endorsement of the undersigned."

"It has come to my attention that Inmate Cooke is scheduled for a parole board hearing for consideration of a parole date. I completely recommend Cooke be given the opportunity to reenter society as a fully productive citizen."

"I fully recommend that Inmate Cooke be given strong consideration for parole. I expect and anticipate that he will continue his helpful deeds and become a positive asset to the community."

"Any consideration given regarding Inmate Cooke's release . . . would be a great service to society."

"I sincerely believe that if given the opportunity he would be a productive citizen. I fully recommend his consideration for parole and release."

In addition, a Correctional Lieutenant stated, "during my five year working relationship with him . . . Cooke has exemplified the epitome of a rehabilitated inmate."

Cooke stated at the hearing that if he were released, he planned to live with his wife in the home they own in Ontario, California. Several employers had offered to hire him upon his release. The offers included a "guaranteed job placement" with the Clair Foundation, a part-time position as a computer assistant for a general contractor, and a full-time telemarketing position with Prudential

Realty.  The Board also reviewed letters from several of Cooke's relatives who stated that they would assist him both financially and emotionally upon his release from prison.  In total, twenty-nine of Cooke's family members and close friends wrote letters to the Board requesting that he be granted parole.  The Board received no letter or other statement of opposition to parole from the district attorney's office or any law enforcement agency.

The Board also reviewed two psychological evaluations prepared by prison psychologists, both of which stated that Cooke suffers no mental health problems. The first evaluation, dated October 9, 1996, described Cooke as a "self-motivated person" who "can be counted on to maintain or improve the gains made while he has been incarcerated."  The second evaluation, dated February 14, 2000, and specifically prepared for Cooke's November 2002 hearing, described Cooke as "an exemplary inmate" and stated that Cooke would "not present a problem to society" if released.  The evaluation contained some inaccurate information with respect to Cooke's ethnicity and family background.[5]  Because there were "so many

_____

[5]Specifically, the report stated that Cooke is Polynesian, when in fact he is of mixed African American and Polynesian descent; identified Cooke's family's religious affiliation as Mormon, when in fact they are  "nondenominational"; and stated that Cooke's parents divorced when he was twelve years old, when in fact they divorced when he was five.  In addition, although a later section of the report contained accurate information about Cooke's marital status, the first page of the report described him as "single married."

inconsistent and erroneous statements" in the second report, the Board determined that it "lack[ed] credibility," and thus said that it would order another report.

The Board also reviewed Cooke's disciplinary record. Cooke had received only two written disciplinary infractions; they were issued within five months of each other and both were issued during the first year and a half of his incarceration. In September of 1992, he was issued a disciplinary citation for not following orders when a corrections officer told him to remove food from another prisoner's tray.[6] In February of 1993, he was issued a second citation for refusing to clean up another inmate's feces when asked to do so by a corrections officer. Cooke accepted responsibility for both violations.

The Board also discussed a third disciplinary infraction that appeared in Cooke's file, for possession and trafficking of marijuana. Cooke's attorney informed the Board that because prison officials had found that the charge was unfounded, it had been dismissed, and therefore it should not have been in Cooke's file. The Board said that it would look into the issue further, but nonetheless considered this alleged infraction in deeming Cooke unsuitable for parole. The

_____

[6]When asked about this disciplinary infraction, Cooke explained to the Board that "there's a thing with prisoners that another prisoner shouldn't touch another man's food. And so what happened was my supervisor said, there is four hot dogs on this tray. Take two off. And I just told him I really – I said, honestly, I can't do that. I can't take food off another man's tray."

10

record reflects that the charge was, in fact, dismissed and thus should not have been considered by the Board.

Finally, the Board reviewed Cooke's 2002 Life Prisoner Evaluation, which had been prepared by Cooke's corrections counselor and was based on the information before the Board as well as his own experience supervising Cooke. In the report, the counselor concluded that

> [c]onsidering the commitment offense, prior record and prison adjustment, the writer believes the prisoner would probably pose a low degree of threat to the public at this time, if released from prison. This belief is based on Inmate Cooke not having any prior record of criminal conduct . . . and the circumstances of the instant offense. He does not appear to be criminally minded and has a good insight into himself. Inmate Cooke has been able to maintain himself relatively disciplinary free during the 11 years of incarceration. Inmate Cooke has shown marked progress toward maintaining an overall positive program and attitude.

After reviewing the foregoing evidence, the Board determined that Cooke was unsuitable for parole because he "would pose an unreasonable risk to society if released from prison." The Board based this determination on the following findings:

> Firstly, the commitment offense was carried out in an especially cruel and callous manner. It was carried out in a premeditated manner. It was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. . . . . Institutionally, [the inmate] has not yet fully participated in beneficial self-help and/or therapy programming. He has not yet developed a marketable skill that can be put to use upon

11

release. He's had two [disciplinary violations] . . . One . . . for . . . possession, trafficking marijuana. . . . [A]nother . . . for disobeying rules and regulations. The psych report dated 2/14/2000 is . . . favorable. But it lacks credibility with myself and with the Panel. . . . [T]he prisoner does need self-help and/or therapy programming in order to face, discuss, understand, and cope with stress in a nondestructive manner. And to face, discuss, and understand the causative factors that led to the life crime. Until progress is made, he continues to be unpredictable and a threat to others. . . . . He needs to complete a vocation.

After the Board orally stated these findings, Cooke asked for advice about what he could do "in order to be found suitable." The Board explained that he needed to complete a vocation because "it not only shows that you . . . can grow as a person[, it also] . . . shows that you can set goals and complete goals and get something done."

## C.

On December 19, 2003, Cooke filed a petition for a writ of habeas corpus in Alameda County Superior Court. Three days later, on December 22, 2003, the court denied the petition. In its entirety, the order denying the petition reads as follows:

The Court having reviewed the defendant's Ex Parte Petition for Writ of Habeas Corpus, filed on December 19, 2003, orders said motion be DENIED.

The Petition fails to state a prima facie case for relief sought. The record submitted by Petitioner does not support the Petitioner's claims that his Constitutional and statutory rights were violated by the [Board of Prison

12

Terms].  The record indicates that there was some evidence, including but certainly not limited to the life offense, to support the board's denial of Petitioner's parole.

Cooke filed a habeas petition with the California Court of Appeal, and subsequently a petition for review with the California Supreme Court.  Both were summarily denied.

On October 18, 2004, Cooke filed a habeas corpus petition in federal court.  The district court denied the petition and entered judgment on October 6, 2005.  On October 14, 2005, Cooke timely filed a notice of appeal.

## II.

"We review de novo a district court's decision to deny a petition for habeas corpus."  *Bailey v. Hill*, 599 F.3d 976, 978 (9th Cir. 2010).

The State contends that we lack jurisdiction over this appeal because Cooke has not obtained a certificate of appealability, as required under 28 U.S.C. § 2253(c).  Cooke originally applied for a certificate of appealability in the district court, but withdrew his application in light of our decision in *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005), which held that a federal habeas petitioner challenging the denial of parole was not required to obtain a certificate of appealability.  In *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc), however, we overruled *Rosas* and held that a federal habeas petitioner must obtain

13

a certificate of appealability to invoke appellate jurisdiction over this type of claim. "We may issue such a certificate *sua sponte*," *id.* at 554, and we do so here. Like the petitioner in *Hayward*, Cooke "had followed our prior decisions when he proceeded without a certificate, and he has 'made a substantial showing of the denial of a constitutional right.'" *Id.* at 554-55 (quoting 28 U.S.C. § 2253(c)(2)). We therefore certify for appeal the issue whether Cooke was denied parole in the absence of "some evidence" of current dangerousness, and thus in violation of his federal right to due process.[7]

Because Cooke filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we may not grant relief unless the state court's adjudication of his claim "resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Doody v. Schriro*, 596 F.3d 620, 634 (9th Cir. 2010) (en banc) (citation omitted).

---

[7]Because we resolve this issue in Cooke's favor, we need not reach the other issues that he raises on appeal.

14

The State contends that the constraints imposed by AEDPA preclude federal habeas relief on Cooke's claim. This argument is foreclosed by our recent decision in *Hayward v. Marshall*. *See also Pearson v. Muntz*, — F.3d —, 2010 WL 2108964 (9th Cir. May 24, 2010). In *Hayward*, we held that due process challenges to California courts' application of the "some evidence" requirement are cognizable on federal habeas review under AEDPA. *Hayward*, 603 F.3d at 561-64. Under the standard announced in *Hayward* for California parole cases, federal habeas courts must accord due deference to the state court decision and thus must determine "whether the California judicial decision approving the governor's [or the Board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" *Id.* at 563 (quoting 28 U.S.C. § 2254(d)(1)-(2)). It is to that question we now turn.

III.

As we have noted, the last reasoned state court decision addressing Cooke's claim stated that the record contained "some evidence, including but certainly not limited to the life offense, to support the board's denial of [Cooke's] parole." To determine whether this decision "was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable

15

determination of the facts in light of the evidence,'" *id.* (quoting 28 U.S.C. § 2254(d)(1)-(2)), we must examine the nature and scope of the federally enforceable liberty interest created by California's "some evidence" requirement.

## A.

State parole systems "may create liberty interests in parole release that are entitled to protection under the Due Process Clause." *Bd. of Pardons v. Allen*, 482 U.S. 369, 371 (1987) (citing *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12 (1979)). California's "some evidence" requirement is a component of the liberty interest created by the parole system of that state. In *Greenholtz*, the Supreme Court lamented that the absence of litigation of the issue in state court had "denied [it] the benefit of the Nebraska courts' interpretation of the scope of the interest, if any, the [Nebraska parole] statute was intended to afford to inmates." 442 U.S. at 12. Here, in determining whether the decision of the Alameda County Superior Court was an unreasonable application of California's "some evidence" requirement, we have the benefit of extensive guidance from the California Supreme Court as to the scope of the liberty interest at issue.

The California Supreme Court has explained that the "some evidence" requirement is mandated by the state regulatory, statutory, and constitutional

16

provisions that govern parole decisions in California. *In re Rosenkrantz*, 59 P.3d 174, 201-03 (Cal. 2002). The requirement imposes substantive rather than purely procedural constraints on state officials' discretion to grant or deny parole: "a reviewing court . . . is not bound to affirm a parole decision merely because the Board or the Governor has adhered to all procedural safeguards." *In re Lawrence*, 190 P.3d 535, 552 (Cal. 2008). Rather, the court must ensure that the decision to deny parole is "supported by some *evidence*, not merely by a hunch or intuition." *Id.* at 554.

Under California law, "the paramount consideration for both the Board and the Governor" must be "whether the inmate currently poses a threat to public safety and thus may not be released on parole," *id.* at 552, and "the facts relied upon by the Board or the Governor [must] support the ultimate decision that the inmate remains a threat to public safety." *Id.* at 554. Accordingly, for a reviewing court "the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety." *Id.* at 553; *see also Hayward*, 603 F.3d at 562 (noting that "'some evidence' of future dangerousness is indeed a state *sine qua non* for denial of parole in California" (citing *Lawrence*, 190 P.3d at 549; *In re Shaputis*, 190 P.3d 573, 582 (Cal. 2008)).

17

The California Supreme Court has expressly rejected the argument "that the aggravated circumstances of a commitment offense inherently establish current dangerousness." *Lawrence*, 190 P.3d at 554. Although the Board or the Governor may consider the circumstances of the commitment offense when making a decision to grant or deny parole,

> the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

*Id.* at 555 (cited in *Hayward*, 603 F.3d at 562). In sum, a reviewing court must consider "whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor." *Id.* at 560. Thus, there must be more than the crime or its circumstances alone to justify the Board's or the Governor's finding of current dangerousness.[8]

B.

_____

[8]In *Hayward*, we used "current dangerousness" and "future dangerousness" interchangeably when referring to the finding for which there must be "some evidence." There is no meaningful distinction between the two terms.

18

Bearing in mind the foregoing considerations as to the scope of the federally enforceable liberty interest created by California's "some evidence" requirement, we turn now to the state court decision upholding Cooke's denial of parole. As we have noted, the state court found that the Board's decision was supported by some evidence "including but certainly not limited to the life offense." Because the state court's decision does not reveal which of the Board's findings it believes supported the denial of parole, other than "the life offense," and which, if any, did not, we will examine each of the Board's other stated reasons for denying parole.

One of the bases upon which the Board deemed Cooke unsuitable for parole was the finding that the February 14, 2000 psychological evaluation prepared for the hearing was unreliable. The record supports the Board's finding that the evaluation contained numerous errors and inconsistencies, and the Board was clearly justified in disregarding it in its entirety. A properly disregarded piece of favorable evidence, however, cannot possibly constitute evidence of current dangerousness; that proposition is illogical on its face. Evidence that is excluded is not probative of anything.

The Board also relied on the disciplinary infractions contained in Cooke's file: one for trafficking marijuana, and two for disobeying prison rules and regulations. As noted *supra*, the marijuana trafficking charge had been dismissed

19

as unsubstantiated, and thus should not have been considered by the Board. The other two offenses occurred within the first year and a half of Cooke's imprisonment; one was based on Cooke's refusal to clean up another's man's feces, and the other on his refusal to take food off another man's tray. These two minor and non-violent occurrences, which occurred in 1992 and 1993, cannot reasonably be viewed as evidence that Cooke posed an unreasonable risk to public safety in 2002, especially as he had been discipline-free for nearly a decade. Accordingly, Cooke's disciplinary record does not provide evidence of current dangerousness.

Next, the Board found that Cooke "has not yet fully participated in beneficial self-help and/or therapy programming," and that he needed more of such programming to "cope with stress in a nondestructive manner" and to "face, discuss, [and] understand the causative factors that led to the life crime." The Board, however, failed to identify any evidence that supports such a conclusion. Cooke has received numerous accolades for his extensive participation in self-help groups and programming; indeed, he has designed such programming and is now leading such groups. Nothing in the record so much as hints at the possibility that Cooke might need further programming in order to become non-dangerous, or even that he suffered from stress of any kind while in prison. Accordingly, the

20

Board's bare assertion that Cooke needs additional programming cannot reasonably be viewed as providing evidence that supports a finding of current dangerousness.

Similarly, the Board found that Cooke needed to obtain certification in a trade to make himself marketable after his release and to demonstrate that he "can grow as a person . . . can set goals, . . . complete goals and get something done." This finding, again, is wholly without evidentiary support. The record before the Board demonstrates that Cooke has a strong educational background – he graduated from high school with a high grade point average, attended the University of New Mexico, and was close to completing a bachelor's degree in finance – and possesses many marketable skills. Nothing in the record suggests that Cooke would have any difficulty obtaining employment upon release; to the contrary, the Board recognized that he had several standing job offers in a range of fields, from counseling to information technology to real estate. Moreover, the record was full of praise for Cooke's ability to grow as a person, to set goals for himself, and to complete tasks. Indeed, the record was replete with glowing praise from Cooke's supervisors regarding his exceptional diligence, positive attitude, and strong work ethic. No evidence suggests that Cooke's certification in a trade would have any benefit, let alone that such certification is necessary to render him

21

non-dangerous.  Accordingly, the Board's wholly unsupported *sua sponte* finding with regard to Cooke's failure to obtain certification in a trade does not provide evidence of current dangerousness.

The remaining findings the Board deemed supportive of a denial of parole all relate to the circumstances of Cooke's commitment offense.  We need not decide whether these findings are themselves supported by the record, however, because they cannot, standing alone, constitute the requisite evidence of current dangerousness.  As the California Supreme Court has held, the circumstances of a commitment offense cannot constitute evidentiary support for the denial of parole "unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." *Lawrence*, 190 P.3d at 555.  Cooke had no pre-incarceration history suggesting dangerousness; no history during his time in prison that would support such a finding; no testimony, report, or other evidence regarding a hostile demeanor; and no indication of a disturbed mental state or a mental state that would otherwise suggest current dangerousness.  Accordingly, assuming the validity of the Board's findings as to

22

the circumstances of the commitment offense, there is no other evidence that would, as required by *Lawrence*, reasonably support the finding of "some evidence" of current dangerousness.

In sum, each of the Board's findings (other than those regarding the circumstances of the commitment offense)[9] lacked any evidentiary basis. Nothing in the record supports the state court's finding that there was "some evidence" in addition to the circumstances of the commitment offense to support the Board's denial of Petitioner's parole. The Parole Board's findings were individually and *in toto* unreasonable because they were without evidentiary support. When habeas courts review the "some evidence" requirement in California parole cases, both the subsidiary findings and the ultimate finding of some evidence constitute factual findings. Here, there was no evidence that reasonably supports either the necessary subsidiary findings or the ultimate "some evidence" finding. Accordingly, we hold that the state court decision was "'based on an unreasonable determination of the facts in light of the evidence.'" *Hayward*, 603 F.3d at 563 (quoting 28 U.S.C. § 2254(d)(2)). Cooke is entitled to a writ of habeas corpus.

IV.

---

[9]As we have explained, we need not and do not decide whether the Board's findings with regard to the circumstances of the commitment offense are supported by the record. We simply assume, for purposes of this opinion, that they are.

23

For the foregoing reasons, we reverse the district court and remand with instructions to grant the writ.

REVERSED and REMANDED.

## Counsel Listing

Michael Satris (argued), Law Office of Michael Satris, Bolinas, California; Amy F. Morton, Morton & Russo, Vallejo, California, for Petitioner-Appellant.

Jessica Nicole Blonien (argued), Office of the California Attorney General, Sacramento, California; Elizabeth S. Kim, Office of the California Attorney General, Oakland, California, for Respondents-Appellees.